McKAY *v.* HARGIS.

1. APPEAL AND ERROR—DIRECTED VERDICT—JUDGMENT NON OBSTANTE VEREDICTO—EVIDENCE—CONTRIBUTORY NEGLIGENCE.

The facts in an automobile accident case are viewed favorably to plaintiff, as did the jury, when dealing with issue as to whether or not the defendant's motions for directed verdict or for judgment *non obstante veredicto* should have been granted because of plaintiff's alleged contributory negligence.

2. AUTOMOBILES—AUTHORIZED EMERGENCY VEHICLES—INSTRUCTIONS —SPEED.

Instruction that plaintiff policeman in patrol car had a preferred status as an authorized emergency vehicle and that as the driver thereof he was required to exercise that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances, when taken in connection with instructions as to applicable statutes and conditions contained therein, was proper, in policeman's civil action against motorist whom officer was endeavoring to apprehend for traffic violation and exceeded the speed limit in doing so (CLS 1954, § 257.2).

3. SAME—AUTHORIZED EMERGENCY VEHICLE—NEGLIGENCE.

The added obligations of due care and of not endangering life and property placed upon a police officer when driving an

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 886.
[2] 5A Am Jur, Automobiles and Highway Traffic §§ 41, 288.
[3] 5A Am Jur, Automobiles and Highway Traffic §§ 205, 300.
[4] 5A Am Jur, Automobiles and Highway Traffic §§ 211, 684.
[6] 15 Am Jur, Damages § 71.
[7] 15 Am Jur, Damages § 72.
[8, 9] 15 Am Jur, Damages § 204.
[10] 15 Am Jur, Damages § 220.
Excessiveness of damages in action by person injured for personal injuries not resulting in death. 46 ALR 1230, 102 ALR 1125, 16 ALR2d 3.
[11] 53 Am Jur, Trial § 538.
[12] 53 Am Jur, Trial § 463 *et seq.*

authorized emergency vehicle, imposed on him by statute, must be read in the light of the situation he faces and the duty to the public which he is called upon to perform (CLS 1954, § 257.2).

4. SAME—AUTHORIZED EMERGENCY VEHICLE—SPEED—UNSIGNALED LEFT TURN—SUDDEN EMERGENCY.

Plaintiff police officer was exempted from speed limit when attempting in an authorized emergency vehicle to apprehend defendant for traffic violation and was confronted with a sudden emergency when defendant suddenly and without signaling made a left turn from the right-hand traffic lane, hence, plaintiff's loss of control of the patrol car was not contributory negligence as a matter of law (CLS 1954, § 257.2).

5. SAME—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Preponderance of evidence presented in policeman's action against lawbreaking defendant who proximately caused plaintiff's injuries *held*, not against jury's verdict for plaintiff on issue of contributory negligence.

6. DAMAGES—PERSONAL INJURIES.

There is no absolute standard by which the amount of damages in personal injury cases can be measured.

7. SAME—PAIN AND SUFFERING.

The amount of damages allowed for pain and suffering in a personal injury case must rest in the sound judgment of the triers of the facts.

8. SAME—EXCESSIVE VERDICT.

Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive.

9. SAME—PREJUDICE—SYMPATHY—EVIDENCE.

A court will not substitute its judgment for that of the jury unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy, if it is within the range of the testimony.

10. SAME—POLICE OFFICER—PAIN AND SUFFERING—KNEE INJURY— EARNING CAPACITY.

Verdict of $20,000 for 25-year-old police officer who sustained the loss of one patella and was so injured as to be unable to function as patrolman or to secure promotion, suffered at least 2 operations and much pain and suffering *held*, not excessive.

11. TRIAL—REQUESTS TO CHARGE.

The practice of labeling plaintiff's and defendant's requests to charge is not approved, although, where charge is complete and fair, it is not regarded as prejudicial.

12. SAME—ARGUMENT OF COUNSEL.

Defendant motorist whom plaintiff police officer was seeking to apprehend when injured *held*, not to have been prejudiced by argument to jury presented by plaintiff's counsel.

Appeal from Ingham; Coash (Louis E.), J. Submitted June 25, 1957. (Docket No. 69, Calendar No. 46,992.) Decided March 5, 1958.

Case by Kenneth W. McKay against Jerry Hargis, doing business as Jerry's Used Cars, for personal injuries sustained by him in automobile accident while attempting, as police officer, to apprehend defendant for traffic violation. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Jack W. Warren,* for plaintiff.

*Claude J. Marshall* and *Leonard B. Crandall,* for defendant.

EDWARDS, J. An Ingham county jury awarded $20,000 damages to the plaintiff in this case. Plaintiff McKay was a police officer of the city of Lansing who suffered injuries on February 18, 1954, at about 11 p. m., when his police car went out of control and struck a tree while plaintiff was engaged in pursuing defendant Hargis because of alleged traffic violations.

On appeal defendant's substantial claims are (1) that plaintiff was guilty of contributory negligence as a matter of law and, hence, that defendant's motions for a directed verdict or judgment *non ob-*

*stante veredicto* should have been granted; and (2) that the award was grossly excessive.

In dealing with the first of these issues, we recite the facts from the view of them favorable to plaintiff which the jury apparently took. *Gapske* v. *Hatch,* 347 Mich 648; *Cabana* v. *City of Hart,* 327 Mich 287 (19 ALR2d 333).

The first portion of this story we will quote from the testimony of plaintiff's witness Martin, a police officer who was riding in the right-hand front seat of the police car beside the plaintiff.

"I had been a member of the Lansing police force at the time of the accident approximately 2 years and 9 months. During that time I had various duties. I had worked about 1 year of the time I had been working for the Lansing police department at the time of the accident in patrol duty from a scout car. On the evening of February 18, 1954, I observed the defendant's car approaching from the west on Grand River at the time. Both cars were approaching the Larch street intersection. The Cadillac driver executed a left-hand turn, cutting the corner, and went north on Larch street. He swung to the right-hand side of Larch as he completed the turn. At that time Mr. McKay and I decided to follow him and stop the driver for making the turn as he did.

"We were about 3 cars behind the Cadillac when we pulled around the corner to follow him. We were about 1 car length behind at Liberty street intersection, as the driver of the Cadillac definitely slowed down and we closed the gap. Both cars were going from 15 to 25 miles per hour from the time they turned the corner at Larch up to Liberty. I can't say to what speed the driver of the Cadillac slowed at Liberty. We did not pull up alongside the defendant at any time nor did we sound our siren in the first block or have our oscillating red light on at any time. In the first block north of Grand River,

we fell in behind the Cadillac, intending to stop him and tried to get up alongside of the Cadillac car. The speed of both cars was approximately constant from Grand River to Liberty street and then the defendant slowed down before he reached the intersection and when in the intersection, he started to accelerate the speed of his car. The defendant accelerated rapidly and the police car took out in pursuit of the Cadillac. When the Cadillac reached the railroad tracks, the police cruiser was doing 65 to 70 miles per hour and the defendant was gaining on the cruiser, increasing the distance between the 2 cars slightly. We were about 4 car lengths behind the Cadillac when we crossed the railroad tracks. When we reached the city limits at Chilson street, the speed of the police cruiser was 85 and 90 miles per hour. When the defendant crossed the railroad tracks, the Cadillac was near the center line of the street. At the first curve, the driver went to the extreme west edge of the highway, the outside lane for southbound traffic. The driver of the Cadillac at the time he passed the Williams car, was entirely to the left of the center line of the highway."

The events from this point on are described thus by an apparently disinterested witness, Verne Williams, Jr., the driver of the car just referred to above:

"My full name is Verne Williams, Jr. I live at 2780 E. East Grand River avenue, I recall the evening of February 18, 1954. I was driving north on US-27, in my 1949 Oldsmobile. My wife was with me. She is not here in court. I know where the Red Rail is located north of the city of Lansing. While driving north and when just south of the intersection of Community street and US-27 I became aware of the presence of a police vehicle. I was then outside the city limits, traveling in the inside northbound lane. The lane closest to the center line. The police vehicle was then near the city limits about 2-1/2 blocks south of me. I became aware of its

presence when I heard the siren. I then looked in the rearview mirror and saw the light of the car. My hearing is normal. There was not room because of the traffic for me to at once pull over to the right side of the road but I did later pull over to the right shoulder. Before I got over to the shoulder I became aware of the presence of the Cadillac. It was coming north straddling the double yellow line, 4 or 5 car lengths behind me. I was then in the inside lane, traveling at 45 miles per hour which is the speed limit for that zone. Based on 18 years driving experience I would estimate that the Cadillac approached and passed me at about twice my speed. At the time the Cadillac passed I was in the process of taking my car into the outside lane. In passing the driver of the Cadillac swung over to his left into the southbound lane. After he passed and when several car lengths ahead of my car the Cadillac driver cut to the right in front of me. This did not cause me any concern because by the time he passed me I was out of the way and in the outside lane. He then swung to the right, slowed down and proceeded north for a short distance along the shoulder of the road when he made an abrupt turn into the north entrance of the Red Rail parking lot.

"Defendant's exhibit 'A' indicates that the north entrance is 46 feet wide. The police car went into a spin and hit a tree. The driver of the police car apparently elected to take the left side in order to avoid striking the Cadillac which was directly across the pavement. The police car caught on fire. I helped the officer out of the police car."

Defendant produced no eyewitness other than himself, and his testimony is generally to the effect that while he drove the car in question at the time and place in question, he did not drive it at the unlawful speeds cited, and that the turn he made resulted from his sudden decision to stop at the Red Rail tavern, which he proceeded to do without ever knowing of any police chase or accident.

Defendant's version apparently strained the credulity of the jury too far. It does ours, too.

The jury patently found defendant negligent and found that defendant's negligence was a proximate cause of plaintiff's injury. No appeal is taken on this point. Defendant now claims that plaintiff's own version of the facts shows that he was guilty of negligence which contributed as a proximate cause to his own injury, and that there was no evidence from which the jury could properly have found the contrary.

It appears beyond doubt that at the time and place of the accident plaintiff's police car was traveling in excess of the speed limit and was engaged in overtaking defendant's automobile. The evidence presented by plaintiff, and accepted by the jury, showed that plaintiff was engaged in official police work in seeking to apprehend the defendant.

Michigan law authorizes police vehicles to exceed the speed limit while engaged in emergency work, providing a siren is sounded and life and property are not endangered thereby:

"(a) The provisions of this chapter applicable to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles owned or operated by the United States, this State or any county, city, town, district, or any other political subdivision of the State, subject to such specific exceptions as are set forth in this chapter with reference to authorized emergency vehicles.

"(b) The driver of any authorized emergency vehicle when responding to an emergency call, but not while returning therefrom, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

"(c) The driver of an authorized emergency vehicle may:

"1. Park or stand, irrespective of the provisions of this act;

"2. Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

"3. Exceed the prima facie speed limits so long as he does not endanger life or property;

"4. Disregard regulations governing direction of movement or turning in specified directions;

"(d) The exemptions herein granted to an authorized emergency vehicle shall apply only when the driver of any said vehicle while in motion sounds audible signal by bell, siren or exhaust whistle as may be reasonably necessary, and when the vehicle is equipped with at least 1 lighted lamp displaying a flashing, oscillating or rotating red light visible under normal atmospheric conditions from a distance of 500 feet to the front of such vehicle, except that an authorized emergency vehicle operated as a police vehicle need not be equipped with or display a red light visible from in front of the vehicle." CLS 1956, § 257.603 (Stat Ann 1952 Rev § 9.2303).

See, also, CLS 1954, § 257.2 (Stat Ann 1952 Rev § 9.1802); CLS 1956, § 257.632 (Stat Ann 1952 Rev § 9.2332); 5 Am Jur, Automobiles, § 294.

Another section requires all drivers to yield the right-of-way to authorized emergency vehicles by pulling to a stop at the right side of the roadway. CLS 1956, § 257.653 (Stat Ann 1952 Rev § 9.2353).

The applicable portions of these statutes and the conditions contained therein were included in the careful charge delivered to this jury by the circuit judge.

Defendant, however, objects with vehemence to the following paragraph of the judge's charge quoted below:

"Mention has been made in this case of alleged contributory negligence on the part of the plaintiff, Kenneth W. McKay. In determining whether or not Kenneth McKay was guilty of contributory negligence, you should keep in mind the preferred status

afforded an authorized emergency vehicle and the driver thereof. You should bear in mind that the driver of such a vehicle is required to observe and exercise that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances."

When this paragraph is read in context with the provisions of the motor vehicle code also quoted in the judge's charge, we find no error contained therein. The law does under these circumstances accord "preferred status" to a driver of a police vehicle in several different exemptions—one of which is an exemption from the speed limit.

We believe that plaintiff's duty to use due care must be viewed by the jury in the light of what his official duties required him to do. The testimony previously quoted indicated that, at the point of the accident, the policemen were seeking to apprehend defendant while he was engaged in reckless driving. It was plaintiff's plain duty as a police officer so to do.

The testimony also indicated plaintiff was claiming his statutory right-of-way and speed limit exemption by siren and flasher-light warnings.

The added obligations of due care and not endangering life and property imposed on him by the statute must be read in the light of the situation he faced and the duty to the public which he was called upon to perform. *Balthasar* v. *Pacific Electric R. Co.,* 187 Cal 302 (202 P 37, 19 ALR 452); *Lucas* v. *City of Los Angeles,* 10 Cal2d 476 (75 P2d 599); *Hartnett* v. *Standard Furniture Co.,* 162 Wash 655 (299 P 408, 33 NCCA 107).

In *Edberg* v. *Johnson,* 149 Minn 395, 399 (184 NW 12), the Minnesota supreme court held as follows:

"We do not hold that an officer, when in pursuit of a lawbreaker, is under no obligation to exercise a reasonable degree of care to avoid injury to oth-

ers who may be on the public roads and streets. What we do hold is that, when so engaged, he is not to be deemed negligent merely because he fails to observe the requirements of the motor vehicle act. His conduct is to be examined and tested by another standard. He is required to observe the care which a reasonably prudent man would exercise in the discharge of official duties of a like nature under like circumstances."

We know of no better standard by which to determine a claim of negligence on the part of a police officer than by comparing his conduct, as this circuit judge suggested, to "that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances."

Defendant does not point to any aspect of negligence on plaintiff's part other than his speed in his attempt to overtake the defendant, and his subsequent loss of control. The statutory exemption plainly authorized some exceeding of the speed limit. As to loss of control, plaintiff was plainly confronted by an unexpected emergency by defendant's sudden and unsignaled left turn from the right-hand lane. *Sun Oil Company* v. *Seamon*, 349 Mich 387; *Kolehmainen* v. *E. E. Mills Trucking Co., Inc.*, 301 Mich 340; *Lindenfeld* v. *Michigan Interstate Truck Co.*, 274 Mich 681. We do not find here any failure to observe, as in *City of Kalamazoo* v. *Priest*, 331 Mich 43. The question as to whether plaintiff under these circumstances exceeded the bounds of due care and, by so doing, himself endangered life and property was a question for the jury (or the trier of the facts). *Eggebeen* v. *Red Top Cab Company of Grand Rapids*, 334 Mich 490; *Theisen* v. *Detroit United Railway*, 163 Mich 68; *Veek* v. *Tacoma Suburban Lines, Inc.*, 49 Wash2d 584 (304 P2d 700).

The jury was properly instructed and their award indicated that they found plaintiff free of contrib-

utory negligence. We find no error in the submission of that issue; and the testimony does not, in our view, preponderate against the award.

We are asked to pass on 1 additional substantial ground for appeal.

Defendant argues that the jury award of $20,000 is grossly excessive, when compared to plaintiff's injuries.

In *Cleven* v. *Griffin,* 298 Mich 139, 141, this Court said:

"There is no absolute standard by which we can measure the amount of damages in personal injury cases. The amount allowed for pain and suffering must rest in the sound judgment of the triers of the facts. *Watrous* v. *Conor,* 266 Mich 397; *Weil* v. *Longyear,* 263 Mich 22. Courts are reluctant to disturb verdicts of juries for personal injuries on the ground that the amount is excessive. *Cawood* v. *Earl Paige & Co.,* 239 Mich 485. We do not usually substitute our judgment for that of the jury unless the verdict shocks the conscience or has been secured by improper means, prejudice or sympathy. *Watrous* v. *Conor, supra; Michaels* v. *Smith,* 240 Mich 671. The verdict was within the range of the testimony and not excessive."

See, also, *Canning* v. *Cunningham,* 322 Mich 182; *Bennett* v. *Hill,* 342 Mich 754; *Hicks* v. *Gillespie,* 346 Mich 593; annotation 16 ALR2d 3.

There was testimony in this case which tended to show:

That on February 18, 1954, plaintiff was removed, in pain, from his wrecked police car while it was in flames; that he was taken to Sparrow hospital where the attending physician found contusions of the left upper arm and chest, and his right knee swollen at the knee joint to 2 to 3 times normal size; that he was given drugs for pain, the right leg was elevated and ice packed; that he was released on crutches aft-

er 7 days; that on March 1st an ounce of blood was removed from the knee by needle; that on March 26, 1954, he returned to limited, desk-type, duty; that on April 23, 1954, he attempted return to regular duty, but returned to his physician for treatment, complaining of "aching type of pain" when he attempted to be on his feet; that on June 2, 1954, he was referred to an orthopedic surgeon; that on July 14th the orthopedic surgeon performed the first operation on plaintiff's knee, to cut away rough cartilage under the kneecap; that as a result of this operation plaintiff was hospitalized 11 days at St. Lawrence hospital, and was on crutches for an additional month; that plaintiff returned to limited duty as a file clerk in the detective bureau, but the knee continued to be weak and painful; that on July 29, 1955, the orthopedic surgeon performed a second operation, which he described as follows:

"The purpose of these patella bones is apparently a protection to the joint in the first place, and when you kneel or get down on your knees you kneel on your knee cap for the most part and it makes for a more comfortable knee. The second thing it appears to do is to act as a fulcrum for these muscles. That is what extends the knee and it improves the possibility of strength, by being out front far enough to give a little fulcrum to the joint so it makes for a stronger knee, theoretically, when the patella is in than when it is out.

"I did remove the patella bone because it was defective. When I removed the patella, I pulled the tendons together and sewed them together so the gap left from the removal of the patella was obliterated by pulling the tendons together. I then sewed the knee back up. Mr. McKay immediately following the operation was not capable of the full use of this knee. Mr. McKay wore a plaster-paris cast which extended from the ankle up to the upper thigh, from July 29, 1955, until the following August

22d. After the cast was removed, he overnight developed pain and went on to develop what we call a foot drop. He couldn't pull his toes up and it seemed to have come from pressure of the cast on the nerve as it crosses the knee. This happens once in a while. To correct the foot drop, I put on a brace which Mr. McKay wore until January 23, 1956. Plaintiff's exhibit 2 is either Mr. McKay's brace or one similar. It is the type of brace used to correct the foot drop Mr. McKay had developed.

"The purpose of this type of brace is to hold the foot up so the patient does not go around dragging his toes. It has springs in the brace, which force the foot to come back up when it is lifted. I last saw Mr. McKay January 23, 1956. At that time he could flex his right knee 30 degrees beyond a right angle. Normally a man of his age and build could flex back completely against the thigh. He did not have the full use of his knee the last time I saw him;"

that plaintiff had not been able to return to his job as patrolman as of the time of trial 2 years after the accident; that he had not been able to continue a second job at which, in 1953, he had earned $663.70; that his superior in the police department, the captain of the traffic and safety bureau, testified that he could not recommend plaintiff for promotion with the physical condition he had at the time of trial; that plaintiff as of the time of the accident was 25 years old, with no physical impairment; that the 3 doctors who testified at trial, including 1 called by defendant, stated that they could not be sure that plaintiff would ever recover full use of his knee.

Under these facts, the jury award does not shock our conscience.

We conclude by noting that while we do not approve the practice of giving verbatim plaintiff's and defendant's requests to charge and labeling them as such (see *Marquette, H. & O. R. Co.* v. *Marcott,* 41 Mich 433; *Schattilly* v. *Yonker,* 347 Mich 660),

on the whole, we found the charge complete and fair, and do not believe defendant was prejudiced either by it, or by opposing counsel's argument to the jury. Affirmed. Costs to appellee.

Dethmers, C. J., and Kelly, Smith, Black, and Voelker, JJ., concurred.

Carr, J., did not sit.

Kavanagh, J., took no part in the decision of this case.