Francis A. TOMCSIK, Jr., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 87 72396.

United States District Court,
E.D. Michigan, S.D.

Sept. 11, 1989.

Arnold M. Gordon, Susan H. Glasier, Weinstein, Gordon & Hoffman, P.C., Southfield, Mich., for plaintiff.

Geneva S. Halliday, Detroit, Mich., for defendant.

### MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

The plaintiff, Francis A. Tomcsik, Jr., filed this action against the defendant United States of America, particularly the Federal Bureau of Investigation (FBI), pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346. Tomcsik claims to have sustained serious injuries as a proximate result of the negligent conduct of certain FBI special agents who were engaged in a high speed pursuit of the fleeing automobile which struck plaintiff. The automobile which struck Tomcsik's car was driven by one Farod Mallory who, at the time of the accident, was a fugitive from the law. This writing constitutes the findings of fact and conclusions of law made by the Court following a bench trial in this matter. For the reasons set forth in the discussion below, the Court finds that under the circumstances in their totality, the defendant's actions were not negligent and therefore the United States may not be held liable for plaintiff's undisputedly serious injuries.

This unfortunate accident occurred on the morning of August 28, 1986. Farod Mallory, the driver of the car which struck the plaintiff, was a known "enforcer" for the Young Boys, Inc., a Detroit street

gang[1] which has twice been prosecuted in this court as a major distributor of narcotics. (See, Criminal Case Nos. 82–80591 and 87–80648). As such, he was considered by law enforcement personnel to be a dangerous individual. According to evidence adduced at trial, at least three warrants for Mallory's arrest had been issued by the time of the accident. These warrants had led to extensive investigations into his whereabouts by law enforcement personnel, including a local Special Task Force comprised of local police and FBI agents. These Special Agents were responsible for apprehending felons wanted on murder, robbery and assault charges.[2]

In August of 1984, a warrant for Mallory's arrest had been issued in connection with a Michigan murder charge. After he fled the jurisdiction to evade arrest, an unlawful flight warrant was also issued. From approximately August, 1984 through August, 1985, FBI Special Agent Prince Ross had been actively engaged in efforts to locate Mallory. In furtherance of that year-long investigation and search, Ross had interviewed witnesses, family, and known associates of Mallory, and conducted daily spot checks of various places known to be frequented by Mallory. In 1985, Mallory had finally been arrested in that matter when he was found hiding in a closet of his mother's house. Subsequent to that arrest he was interviewed by Ross on behalf of federal authorities. Although he was later acquitted of the charges of that arrest, Mallory knew of Ross' ongoing interest in his activities.

In March of 1986, another arrest warrant was issued for Mallory in connection with a criminal sexual conduct charge. Upon his disappearance, a federal warrant for unlawful flight to avoid prosecution was again issued and the search was again assigned to Ross. Ross had reactivated all of his efforts of the prior year, enlisted the assistance of FBI offices in other cities in which Mallory had been sighted, and continued daily spot checks at the homes of Mallory's family, girlfriend, and known associates throughout the spring and summer of 1988. It is with this backdrop that the events leading to the accident of August 28th must be viewed.

On the morning of August 28, 1986, Ross embarked upon what he described as a routine day of investigating the whereabouts of a number of fugitive felons, including Farod Mallory. Ross stated that he had not planned to spend an inordinate amount of time looking for Mallory because he had no reason to believe that Mallory was even in Detroit at the time. He knew from his sources, however, that Mallory was in and out of the city, and included his Mallory spot checks in each day's routine.

At about 10:30 a.m., Ross stopped at the home of Mallory's sister, Lagina Crawford. He was driving a blue two-toned Chevrolet Impala. The car was outfitted with emergency equipment consisting of flashing hazard lights, a siren, a portable blue oscillating light and both FBI and Detroit Police hand-held radios. Ross saw a silver colored car in the Crawford driveway; the same car that he had seen at Mallory's girlfriend's house earlier that morning. The sister's house was on the west side of Plainview Road, north of Fenkell. The driveway was on the south side of the house, screened by a hedge approximately four feet high on the property line. From across Fenkell, Ross could see the top of the parked car above the hedge. Ross decided to stay. To undertake his surveillance, he parked his car on the east side of Plainview facing north, just south of Fenkell. Shortly thereafter, a blue Pontiac 6000 containing officers Richardson and Bloomfield and driven by Kaiser pulled up. Their unmarked car had been leased by the FBI specifically for undercover use by the Task Force and they were equipped with a portable blue oscillating light and FBI and

---

1. Mallory had previously been arrested as a minor for his involvement with Young Boys, Inc. and remanded to the custody of the juvenile authorities.

2. Special agents Prince Ross and Kenneth Kaiser of the FBI, and Sgt. Dennis Richardson and Officer Julie Bloomfield of the Detroit Metropolitan Police (Detroit Police) were all assigned to the Special Task Force in the Detroit area.

Detroit Police hand-held radios. The Pontiac was not equipped with alternating flashing hazard lights or a siren, as was Ross' car. Government witnesses testified that the rented vehicle which Kaiser drove was not intended for use as an emergency vehicle pursuant to M.C.L. § 257.603; M.S.A. § 9.2303, *infra*. Ross explained to the others that he planned to monitor the house briefly, in case someone leaving or entering it might lead him to information concerning Mallory. After less than ten minutes of conversation among the officers the Pontiac departed leaving Ross alone in his car to watch the house.

Within fifteen minutes after the Pontiac had departed, and just as Ross was himself preparing to leave, he saw the heads of two persons getting into the silver car parked in the Crawford driveway. The car then emerged from the driveway and proceeded south on Plainview towards Ross. As the car passed through the intersection at Fenkell and approached Ross' car, he was able to clearly see that there were two persons in the car, and that Mallory was driving, with a woman in the front passenger seat. When the two cars were roughly parallel, Mallory apparently recognized Ross from their prior meeting, accelerated, and sped away down Plainview. Ross immediately turned his car around to commence pursuit. He activated his flashing hazard lights and siren and placed the portable blue oscillating light on the dashboard. He first radioed Kaiser on his hand-held radio for assistance, giving Mallory's direction and a description of the car. Ross could not personally request back-up assistance from marked Detroit Police units because he was unfamiliar with the Detroit Police code system. He could, however, hear police officer Richardson relaying his information to the Detroit Police dispatcher over the Detroit Police radio. During this period, Mallory remained fully within Ross' view as Mallory turned right onto Outer Drive and then left, southbound on Evergreen Road. Ross testified that his intention was to maintain eye contact on the suspect, and to continue to broadcast his whereabouts, but not to attempt an arrest. In response to Ross' radio call, Richardson informed Ross via the Detroit Police radio, that he and Kaiser were near Interstate 96 and Evergreen and would turn north on Evergreen to meet him and the Mallory car. Ross also used his FBI radio to inform any other FBI agents in the vicinity, as well as FBI central dispatch, of Mallory's location.

Meanwhile, Mallory continued south on Evergreen approaching speeds estimated as high as 70–90 miles per hour between intersections. He slowed at the intersections, however, in order to maneuver his car through traffic. Ross testified that his FBI car reached speeds of 40–50 miles per hour, which was fast enough to keep Mallory in view.

As Kaiser's car proceeded north on Evergreen, its occupants spotted Mallory's silver car approaching them at the intersection of Schoolcraft and Evergreen. Before Kaiser reached that intersection, at midblock, he placed a blue oscillating light on the dash of his car and turned a sharp left, maneuvering across the center lane so as to block the two southbound lanes of Evergreen. All three officers exited that vehicle as Mallory came through the intersection of Schoolcraft against a red traffic signal. Richardson ran to the front of their car with revolver and badge drawn and identified himself as a policeman to Mallory's oncoming car. Mallory had deaccelerated somewhat, coming through the intersection. As he approached Richardson in the street beside the blue Pontiac, however, he sped up, swerving in an apparent attempt to run Richardson down. Richardson dove out of the way to avoid being hit, but not before noticing what appeared to be a handgun in Mallory's lap. Mallory then drove around the Kaiser car, entering the northbound lane of traffic in so doing, and bypassed the obstacle altogether, speeding south.

Ross was several car lengths behind Mallory when he witnessed the apparent attempt at a stop. Then, after observing that Mallory had not been stopped, Ross also continued past Kaiser's car to keep Mallory in sight. Kaiser and the others returned to their car and proceeded south on Evergreen, far behind both Mallory and

Ross, and did so without exceeding the posted speed limit or going through any red traffic signals. Mallory's car continued down Evergreen until it came to a crashing halt in the intersection of Joy and Evergreen Roads. After disregarding a red traffic signal, Mallory broadsided the vehicle driven by plaintiff Francis Tomcsik, which had been heading east across the intersection, with a green light on Joy Road. Ross was still about a block behind, but saw the accident occur. As he approached the accident scene, Ross also observed Mallory climb across the woman in the passenger seat and out of the window of his car, and run into an alley. No marked police cars had yet arrived. Ross then stopped his car and undertook pursuit of Mallory on foot. He cornered Mallory in the alley and, after a struggle, subdued, arrested, and returned him to the scene of the accident. By that time, Kaiser's car and several marked police cars were on the scene.

Mr. Tomcsik has brought his claim under the Federal Tort Claims Act, 28 U.S.C. § 1346, (the Act) which states in pertinent part:

> (b) Subject to the provisions of chapter 171 of this title, the district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages … for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Pursuant to the terms of the Act, a federal court is bound to apply the law of the jurisdiction in which the alleged tort occurred. *Fries v. United States*, 170 F.2d 726 (6th Cir.1948). Therefore, it is Michigan law to which this Court must look in ascertaining whether a negligent act or omission has been established in this case. *State Use of Burkhardt v. United States*, 165 F.2d 869 (4th Cir.1947).

The standard under which the facts of a case such as this must be analyzed in Michigan was announced by the Michigan Supreme Court in *Fiser v. City of Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413 (1983). On facts analogous in many respects to those presented here, the Michigan Supreme Court held, *inter alia*, that to avoid governmental liability for injuries to an innocent citizen resulting from a collision during hot pursuit, it must be shown that the officers and agents of the defendant governmental body acted as a reasonably prudent officer would have acted under similar circumstances. Thus, the standard of care owed by the defendant in this case is one of reasonable prudence under all of the circumstances.

The facts before the court in *Fiser* were as follows: On an early October morning, the plaintiff was struck and severely injured by an automobile being chased by the City of Ann Arbor Police. Plaintiff was travelling south on South Main Street. Simultaneously, an automobile driven by Michael Lehman was travelling east on Madison Street, and was being pursued by a fully marked police car with its affixed overhead oscillating lights and emergency siren activated. During that chase, both of the latter two vehicles had attained speeds of up to 110 miles per hour through both residential and business areas. Disregarding a flashing red traffic signal, Lehman had sped through the intersection of South Main and Madison without stopping, and struck plaintiff's car.

That high speed chase had commenced with the officers' attempt to stop Lehman for failing to stop at a flashing stop signal. At one point during the pursuit, Lehman's car had been struck by a police car and temporarily halted, only to speed away again after one of the officers had emerged from their car to approach Lehman. The officer remaining in the police car continued the pursuit, even to the extent of chasing Lehman the wrong way down a one-way street before losing sight of him. A third officer, also driving a fully marked unit, after hearing a radio report sighted Lehman and joined the pursuit, which was

terminated only when Lehman struck that plaintiff's car broadside at the Madison/South Main intersection.

In that case the Supreme Court of Michigan determined that substantial questions of material fact existed, requiring jury determination of whether the officers violated the standard of care due the plaintiff by the city; whether there was an emergency sufficient to justify exposure of citizens to such risk; and whether the officers proximately caused plaintiff's injury. The court also provided clear standards for resolution of such questions in Michigan.

■ The gravaman of plaintiff's complaint in the instant case, as it was in *Fiser*, is that the government's agents acted negligently in this pursuit. The Michigan Supreme Court, in *McKay v. Hargis*, 351 Mich. 409, 88 N.W.2d 456 (1958), set the standard by which a claim of a police officer's negligence is to be determined. The conduct of an officer should be compared to "that care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances." *Id.* at 418, 88 N.W.2d 456. It first must be noted that, under the Michigan statutory scheme, authorized emergency vehicles are granted exemption from compliance with certain of the rules of the road where certain conditions are met. M.C.L. § 257.603; M.S.A. § 9.2303 provides in relevant part:

(b) The driver of an authorized emergency vehicle when responding to an emergency call, but not while returning from an emergency call, may exercise the privileges set forth in this section, subject to the conditions of this section.

(c) The driver of an authorized emergency vehicle may:

(1) Park or stand, irrespective of the provisions of this act.

(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation.

(3) Exceed the prima facie speed limits so long as he does not endanger life or property.

(4) Disregard regulations governing direction of movement or turning in specified direction.

(d) The exemptions granted in this section to an authorized emergency vehicle shall apply only when the driver of the vehicle while in motion sounds an audible signal by bell, siren, air horn, or exhaust whistle as may be reasonably necessary except as provided in subsection (e), and when the vehicle is equipped with at least 1 lighted lamp displaying a flashing, oscillating, or rotating red or blue light visible under normal atmospheric conditions from a distance of 500 feet in a 360° arc....

Further, M.C.L. § 257.632; M.S.A. § 9.2332 states:

The speed limitation set forth in this chapter shall not apply to vehicles when operated with due regard for safety under the direction of the police when traveling in emergencies or in the chase or apprehension of violators of the law or of persons charged with or suspected of a violation, nor to fire department or fire patrol vehicles when traveling in response to a fire alarm, nor to public or private ambulances when traveling in emergencies * * *. This exemption shall not however protect the driver of the vehicle from the consequences of a reckless disregard of the safety of others.

The *Fiser* court determined that, in order for the provisions of M.C.L. § 257.632; M.S.A. § 9.2332 to apply, the officers must show that they reasonably believed an emergency existed. *Fiser*, at 471–72, 339 N.W.2d 413. The question of "[w]hether or not there was an emergency (or circumstances warranting the driver's belief that there was) bringing into play the provisions of the applicable statutes ... is a matter of fact." *Hoffmaster v. McNett*, 2 Mich.App. 709, 711, 141 N.W.2d 352 (1966), *quoted in Fiser*, at 472, 339 N.W.2d 413.

■ However, even if excused by the statutes from obeying all of the traffic ordinances, emergency vehicles must be operated with due regard for the safety of others. *Kalamazoo v. Priest*, 331 Mich. 43, 46, 49 N.W.2d 52 (1951), *cited in Fiser*,

at 472, 339 N.W.2d 413. Hence, the existence of an emergency is but one of several factors which must be reviewed in determining whether an officer's actions were reasonable. Among the additional factors are "the speed of pursuit, the area of the pursuit, weather and road conditions, the presence of pedestrians and other traffic, the presence or absence of audible and visible warnings, and the reason the officers were pursuing the fleeing vehicle." *Fiser*, at 472, 339 N.W.2d 413.

■ The pursuit in the instant case took place at 11:00 a.m. on a summer weekday morning and lasted for approximately 2.8 miles. The sky was clear and the pavement dry. The street on which most of the pursuit and the accident itself took place, Evergreen, is lined by homes set back from the street, and small businesses. In a pretrial deposition, Ross stated that the traffic was "heavy" on August 28th. At trial, Ross qualified his previous testimony by explaining "heavy" traffic to mean "not rush-hour", but heavy for an August mid-morning. There was no evidence introduced to suggest that the volume of traffic was anything other than as Ross credibly testified. Indeed his testimony was credible to the Court in all respects.

Plaintiff contends that Ross' pursuit of Mallory was unnecessary and reckless under the circumstances or that no emergency existed. In this regard, plaintiff offered the expert testimony of Mr. Louis Reiter, a consultant in police procedures. As one familiar with high speed pursuits and the policies necessary to conduct them safely in California, Rieter stated that the FBI's reliance upon local law for policies governing an officer's conduct during pursuits is insufficient. It was his opinion that written policies, specific to the FBI itself in all jurisdictions, were necessary to give officers adequate guidance in the field. When Rieter was a member of the Los Angeles Police Department, a written policy regarding vehicle pursuit was in effect. Special Agent John Anthony of the FBI testified that the FBI's policy was to have no written policy with regard to vehicle pursuits. Agents are instructed to follow the law of the locality in which they are operating. Because the FBI policy-making function is a discretionary one, it cannot be the basis for liability under the Federal Tort Claims Act. The testimony was clear, moreover, that Detroit FBI agents are provided and fully instructed on applicable Michigan law and Detroit Police Department policy, both of which are written.

Reiter then opined that, on the basis of the facts as he understood them to be in this case, Ross did not act as a reasonably prudent officer should in conducting the pursuit. He believed that the circumstances presented a high risk situation which made the very undertaking of a pursuit negligent. An accident was highly likely to occur given Mallory's estimated speeds of 70–90 miles per hour. The only question, to Reiter, was when an accident would occur. Reiter found Ross negligent initially in undertaking a pursuit in a one-man, unmarked and poorly equipped car. Next, he argued that Ross was uncertain as to the whereabouts of his partner and, if nothing else, a shootout was likely. Reiter also stated that Kaiser's attempt to stop Mallory near Schoolcraft was negligent because it was impossible for one car to block traffic to the point of stopping Mallory. Kaiser and Richardson exposed both themselves and the public to too great a threat of harm by simply forcing Mallory into oncoming traffic. Their failed attempt at a stop also spurred him on to drive even faster. Also, Richardson had seen a gun either in Mallory's lap or in his hand, yet never informed Ross of the fact. Reiter concluded his direct testimony by stating that the safety of the public and of the officers themselves was more important than capturing the suspect, under the circumstances, and that he should have been permitted to escape and left for capture on a more auspicious occasion. He also suggested the use of helicopters and a converging team of numerous police vehicles; as more reasonable.

As its expert, the government called Dr. Isaiah McKinnon, who holds a doctorate in Criminal Justice, is a nineteen year command veteran of the Detroit Police Department, and is now the Director of security

of the University of Detroit. After reviewing the materials as Reiter did, Dr. McKinnon concluded that Ross, Kaiser, and all of defendant's agents acted as reasonably prudent officers should, under all of the circumstances of this case. Having trained officers and participated in car stops and pursuits in this very community, McKinnon was very familiar with the policies of Detroit and Michigan State Police, Michigan law, and the guidelines set out in *Fiser*. He determined that, by all of those standards, these officers were not negligent either in initiating or conducting this pursuit.

Dr. McKinnon opined that under the circumstances, Ross acted prudently, performing appropriately under both local police guidelines and the precepts of *Fiser*. Mallory was a highly wanted, dangerous criminal, and Ross had most recently been searching for him for about six months at the time of the accident. After this capture, Mallory was successfully prosecuted for a serious felony and is today in prison. Contrary to the testimony of Reiter, Dr. McKinnon did not believe Kaiser's failed attempt to stop Mallory was negligent. First, it did not pose a serious threat of harm to the public because, according to the testimony, all traffic was stopped or stopping for a red traffic signal at Schoolcraft when Kaiser conducted his mid-block maneuver. Only Mallory was moving on Evergreen at that point.

Dr. McKinnon also testified that it is most unlikely that the attempted stop had actually been a catalyst in propelling Mallory even faster into the plaintiff as claimed, because Mallory had been aware that he had been seen and was being followed since he first saw Ross surveilling his sister's house. Police guidelines call for discontinuance of a pursuit if a clear and present danger to the public exists. This situation did not rise to that level until, unfortunately, Mallory for the first time saw fit to speed straight through an intersection at Joy Road, on which plaintiff was travelling.

A threshold question in determining whether the defendant was negligent in this case is whether the excusatory provisions of M.C.L. § 257.632; M.S.A. § 9.2332 are applicable. As noted earlier, that statute only applies if indeed an emergency existed, or there were circumstances which warranted the belief that an emergency did exist. *Fiser, supra.*

In the case at bar, the government has amply met its burden of showing that an emergency existed. There can be no dispute that Farod Mallory was a violent and dangerous wanted felon, intimately associated with the notorious Young Boys, Inc. gang which dealt in illegal drugs and death. Ross was familiar with Mallory's participation in the gang as an enforcer; a member of what was known as the "A-Team". From mid '84 through mid '85 and for six months of '86, Ross had searched for him. He knew that Mallory travelled between and among several states other than Michigan to evade arrest. He had safe-houses and contacts in several cities.

Plaintiff has argued that the second search for Mallory, undertaken in 1986, was not as difficult as has been claimed because reports had been made to the FBI from informants in the drug world that Mallory had been seen in Detroit during the weeks just prior to August 28, 1986. Assuming, *arguendo* that the information was true and that Mallory was on occasion in the city, the fact is that Mallory remained a fugitive and that the best efforts of the Task Force had failed to locate him. To say that Mallory could have been apprehended another day because he had previously been sighted in the city ignores the reality of the situation; that Mallory had eluded law enforcement up to that point, and was a person whose capture was a matter of significant governmental priority. His free presence in the city presented a very substantial danger to the populace. It was reasonable, under the circumstances, for Ross to conclude that this was an emergency situation triggering the excusatory provisions of M.C.L. § 257.632; M.S.A. § 9.2332, and this Court finds as a matter of fact and law that it was. The situation is totally distinguishable from that of *Fiser*, in which the chase had developed from a simple attempted traffic stop.

Having determined that an emergency existed, the Court now turns to the question of whether this pursuit was conducted with due regard for the safety of others.

On the pursuit course, which was lined with residences and small businesses, Mallory reached speeds estimated at 70–90 miles per hour between intersections and Ross testified that he maintained his own speed between 40 and 50 miles per hour. The speeds were not nearly so high as those reached in *Fiser*, although the emergency was far greater, and road and weather conditions were favorable. There was no testimony introduced to even suggest that any near accidents or indications of total disregard for public safety occurred prior to the intersection where plaintiff was struck.

Ross testified that he engaged his siren, hazard lights and his blue oscillating light immediately upon commencing the pursuit. Special Agents Kaiser and Richardson, however, testified in their depositions that they did not see the blue light or hear the siren as Ross approached them near Schoolcraft. They later changed their deposition testimony, and plaintiff has suggested that their testimony is incredible, as an effort to conform their narratives to Ross'. The changes did not, however, significantly alter the testimony to the point that credibility is affected. The changes merely offer the reasons why the agents may not have heard or seen the signals during this rapidly developing emergency situation. As Kaiser pulled into the southbound lane, the windows in his car were rolled up and the police radios were on. It is very possible, therefore, that Kaiser and Richardson would not hear the siren on Ross' car as he approached them near Schoolcraft. With regard to their failure to see a blue light in Ross' car, both Kaiser and Richardson admittedly were concentrating on Mallory's car as it was coming through traffic. Ross' light, far behind, could very well have been unnoticed by the agents. The testimony of all the agents may, in short, be reconciled. The testimony was clear, moreover, that the oscillating lights, when placed on dashboards, meet the visibility requirements of the statute.

Plaintiff also asserts that defendant was negligent because there had been no attempt to learn whether Mallory was in the house while Ross was surveilling it, before Ross was left alone. The testimony was uniform, however, that none of the agents had any reason to believe that Mallory was in the city, much less in his sister's house, at that time. Under the circumstances, it was reasonable to leave an agent alone on surveillance. Ross also stated that his intent when he turned behind Mallory was only to follow the car and maintain surveillance; to report Mallory's locations for assistance by marked vehicles in a capture. All government witnesses agreed that there was no intention whatsoever to attempt to arrest Mallory without the participation of a large team of agents and officers, both federal and local, with uniforms and marked vehicles.

As noted earlier, the length of the pursuit was approximately 2.8 miles: not long. Traffic conditions were at their safest. The speeds reached were substantially lower than those in *Fiser*. Ross testified that his emergency equipment was activated at the outset of the pursuit and both FBI and police central offices were given notification. M.C.L. § 257.603; M.S.A. § 9.2303, *supra.*, sets forth the requirements for operation of authorized emergency vehicles in emergency situations. Plaintiff contends that the vehicles driven by agents Ross and Kaiser did not comply with the statute and that such non-comliance was negligent. To the contrary, the Court finds that Ross' car was sufficiently equipped to fall within the parameters of the statute. Ross' vehicle had an audible siren, flashing emergency lights, and a blue oscillating light visible at 500 feet. With regard to Kaiser's vehicle, the Court finds that its minimal involvement in the pursuit and observance of the traffic laws did not require that it have the full complement of emergency equipment. It neither reached the speeds of Ross, nor did it proceed against any traffic signals or attempt to keep up with the other vehicles. When used to block traffic, however, it did display the oscillating blue light.

Although the scenarios of *Fiser* and the instant case are similar, there are important differences. Unlike *Fiser*, the agents in this case never pursued the suspect against a one-way street or against lanes of traffic. Police vehicles were operated safely at all times. The road conditions in *Fiser* were poor due to rain. Here, the streets were dry. The speeds attained by both the suspect and the police in *Fiser* exceeded those attained in the case at bar. Eye contact with the suspect was lost in *Fiser*, while the suspect was maintained in view throughout this entire pursuit. Perhaps the most important distinction between the two cases, however, is that Farod Mallory was clearly and undisputedly more than a mere traffic violator or common street thug. He was a member of a notorious gang involved in illegal drug trafficking and murder, and presented a serious threat to the public. Knowing that Mallory was wanted for violent crimes, it was most reasonable to continue the pursuit. His subsequent guilty plea to one count of murder of an indictment under the RICO statute and his current incarceration for that murder confirms Ross' concern.

Plaintiff relies upon the eyewitness testimony of Mrs. Royetta King, to support his contention that Ross was negligently travelling faster than the 40–50 miles per hour that he claims. Mrs. King testified that she saw a car in pursuit about two cars behind Mallory's at the intersection of Evergreen and Joy, the scene of the accident. Plaintiff argues, therefore, that Ross could not have been a quarter mile away as he claimed (although it is undisputed that Ross did overtake the Mallory vehicle, eventually), and therefore that he was travelling as rapdily as Mallory. Mrs. King, however, described the car she believed to be Ross' as black or dark blue, with two persons inside. Ross' car was in fact blue, but it was two-toned blue and predominantly a very light blue. Ross was also, undisputedly, the only person in his car. Mrs. King had been much surprised by the car chase, the accident, and the subsequent armed foot chase, however, and her recollections of these events cannot be given more credit than those of the agents.

There are too many significant differences between the facts and Mrs. King's recollection to fully credit her testimony as identifying the Ross car. The car that she saw two car lengths behind Mallory's does not appear to have been Ross'. Moreover, as noted above, that fact is not a necessarily material one, as it is undisputed that Ross finally caught up, eventually, and overtook Mallory's car at the accident intersection.

Inherent in much of law enforcement activity is the risk that innocent citizens will be harmed by the pursuit of criminals. That risk must be balanced against the even greater certainty of greater damage which flows from governmental failure to enforce the law, or abdication of that responsibility. Implicit in the Michigan Supreme Court's holding in *Fiser* is the need to balance the objectives and necessities of vigorous law enforcement with the safety of the public. Indeed, law enforcement itself is a public safety function. The need to balance the interest of the individual citizen in security from injury by law enforcement against his interest in security from crime has been fully considered by Congress as well, and its priorities are reflected in the provisions of the Federal Tort Claims Act. Under the provisions of that Act, the United States government may be held liable only for a *negligent* act or omission of its agents. Congress has determined that only negligent acts may result in governmental liability, and that each of us as individual citizens must bear the burden of injuries otherwise sustained, as a result of our government's efforts to enforce the criminal laws. It is not the role or privilege of this Court to re-order the priorities clearly established by Congress. It may not permit sympathy in the difficult case at hand to destroy the effect of choices made by more representative branches of government.

The events giving rise to this lawsuit are tragic. The Court, however, cannot conclude that the defendant, through its agents, has acted negligently. The agents were called upon to exercise their judgment in an emergency situation and did so with reasonable prudence.

IT IS ORDERED, THEREFORE, that plaintiff's complaint be and it hereby is dismissed.