ROGERS v CITY OF DETROIT

EWING v CITY OF DETROIT

Docket Nos. 103667, 103668, 105631. Argued November 4, 1997 (Calendar
    Nos. 3-4). Decided May 5, 1998. Rehearing denied *post*, 1207.

Carol Rogers, as personal representative of the estate of John Rogers,
    deceased, brought a wrongful death action in the Wayne Circuit
    Court against the city of Detroit, the Detroit Police Department,
    and Keith Montgomery, claiming that police pursuit of Montgom-
    ery's vehicle, which struck the decedent's vehicle, was negligent
    and constituted a hazard. The court, Michael J. Callahan, J.,
    entered judgment on a jury verdict for the plaintiff, finding the city
    eighty percent at fault and Montgomery twenty percent at fault.
    The court denied the city's motion for a new trial and refused to
    grant the defendants collateral source setoffs, instead ordering that
    the disputed amount be placed in escrow. However, the court failed
    to reduce the city's liability by the twenty percent for which Mont-
    gomery was liable. The Court of Appeals, R. B. BURNS and C. L.
    HORN, JJ. (REILLY, P.J., not participating), affirmed in part in an
    unpublished opinion per curiam and remanded the case, directing
    that the judgment be apportioned pursuant to the verdict and that
    collateral source setoffs be allowed (Docket Nos. 157394, 165659).
    The parties appeal.

Deborah Ann Ewing, for herself and as next friend of Krystal Thomp-
    son, a minor, brought an action in the Wayne Circuit Court against
    the city of Detroit and the Detroit Police Department and its police
    officers, alleging negligent operation of government vehicles and
    gross negligence on the part of the individual police officers, result-
    ing from police pursuit of a vehicle driven by Jay McGuigan that
    struck the plaintiff's vehicle. The court, James R. Chylinski, J.,
    granted summary disposition for the defendants on the basis of
    governmental immunity and the plaintiff's failure to state an action-
    able claim or to raise a dispute of fact to submit to the jury. The
    Court of Appeals, DOCTOROFF, P.J., and MURPHY and FITZGERALD, JJ.,
    peremptorily reversed in an unpublished order with respect to the
    city and the department, but affirmed in favor of the individual
    police officers (Docket No. 147294). The Supreme Court remanded
    the case. 454 Mich 863 (1997). On remand, the Court, DOCTOROFF,

C.J. (MURPHY, J., concurring), and (FITZGERALD, J., concurring in the result only), reversed the grant of summary disposition for the city and the department, holding that sufficient evidence had been presented to raise genuine issues of fact regarding negligence and proximate causation (Docket No. 187297). The defendants appeal.

In an opinion by Justice KELLY, joined by Chief Justice MALLETT, and Justices BRICKLEY and CAVANAGH, the Supreme Court *held*:

It is for the factfinder to determine whether actions of operators of pursuing police vehicles are causes in fact of injuries suffered by a plaintiff as a result of a collision with the vehicle pursued.

1. Under *Fiser v City of Ann Arbor*, 417 Mich 461 (1983), it must be proven that a defendant owed a duty to the plaintiff that was breached, that the breach caused the plaintiff to suffer damages, and that the breach or negligence was a proximate cause of the damages. Defendants have a duty to plaintiffs to exercise care that a reasonably prudent person would exercise while discharging official duties of a similar nature under similar circumstances. Emergency vehicles must be driven with due regard for the safety of others, including bystanders, onlookers, and travelers. Claims of negligence and proximate cause must be submitted to and decided by a trier of fact and not by summary disposition.

2. In *Ewing*, the plaintiffs pleaded facts sufficient to state an actionable claim, including facts in avoidance of immunity. There exists a genuine issue of material fact concerning whether the officers were negligent and, if negligent, proximately caused plaintiffs' injuries. The Court of Appeals correctly reversed the trial court's grant of summary disposition for defendants.

3. In *Rogers*, the trial court did not err in admitting evidence pertaining to the defendants' police-pursuit policies and correctly denied their motion for directed verdict. The conduct of the plaintiff's counsel does not warrant a new trial. The defendants failed to demonstrate that an agreement existed between the plaintiff and third-party defendant Montgomery that capped Montgomery's liability.

4. Also in *Rogers*, the jury was entitled to conclude from the evidence that the city was eighty percent at fault. Under MCL 600.6304(7); MSA 27A.6304(7), where a party's share of an obligation is not collectible from that party, it may be reallocated among the other parties according to percentage of fault. Thus, the city bears a reallocation burden equal to its initial percentage of fault: eighty percent of the verdict, plus eighty percent of defendant Montgomery's twenty percent.

5. The trial court in *Rogers* properly ruled concerning the collateral source rule.

*Ewing,* affirmed and remanded.

*Rogers,* affirmed in part and reversed in part.

Justice TAYLOR, joined by Justice WEAVER, dissenting, stated that a principled application of the law of negligence and the law of governmental immunity demonstrates that these plaintiffs are not entitled to recover from this defendant.

The plaintiffs have not pleaded cases that demonstrate an exception to governmental immunity. The grant of immunity provided by MCL 691.1407; MSA 3.996(107) is broad, and the exceptions to it are to be narrowly construed. The decision to pursue a fleeing motorist does not give rise to an exception to governmental immunity. A narrow construction of the term "operation of a motor vehicle" should not encompass the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself.

Reliance on *Fiser* and legislative acquiescence is flawed. After *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984), *Fiser* is no longer viable. Further, these cases are good examples of the misuse of the doctrine of legislative acquiescence, the prerequisites for its use being so entirely lacking.

Beyond the governmental immunity issue, the plaintiffs could not establish negligence. Causation cannot be established in these cases. The decision to initiate a traffic stop cannot be the proximate cause of a subsequent accident. Also, the mandate of MCL 257.602a; MSA 9.2302(1), that a motorist not wilfully fail to obey a police officer's direction to stop, and a police officer's obligation to apprehend persons breaking the law, permits the officer to rely on the motorist's duty to stop. Therefore, it cannot be said that it is reasonably foreseeable that a motorist will flee at high speed. Additionally, the decision to pursue once the motorist has begun to flee cannot establish cause in fact.

Justice BOYLE, dissenting, stated that the plaintiffs' negligence claims should fail as a matter of law. The defendants' decisions in these cases to initiate a traffic stop and to pursue fleeing motorists cannot reasonably support a finding for the plaintiffs on an element of the cause of action.

214 Mich App 495; 543 NW2d 1 (1995) affirmed.

*Fieger, Fieger & Schwartz* (by *Geoffrey N. Fieger*), *Robb, Messing & Palmer* (by *Dean A. Robb*), and *Bendure & Thomas*, of counsel (by *Mark R. Bendure*), for the plaintiff-appellee in *Rogers*.

*Jeffrey H. Feldman (John A. Lydick*, of counsel), for the plaintiffs in *Ewing*.

*Garan, Lucow, Miller, Seward & Becker, P.C.* (by *Rosalind Rochkind* and *Matthew A. Seward*), for the defendant in *Rogers*.

*Sullivan, Ward, Bone, Tyler & Asher, P.C.* (by *Ronald S. Lederman*), for the defendants in *Ewing*.

Amici Curiae:

*Granzotto & Nicita, P.C.* (by *Mark Granzotto*), for Michigan Trial Lawyers Association.

*Plunkett & Cooney, P.C.* (by *Christine D. Oldani* and *Mary Massaron Ross*), for Michigan Municipal League and Michigan Municipal Liability and Property Pool.

KELLY, J. This appeal is a consolidation of two cases. In each, the primary issue is whether the Supreme Court should overrule or modify its decision in *Fiser v City of Ann Arbor*, 417 Mich 461; 339 NW2d 413 (1983).

The cases involve automobile chases in which the pursued vehicles, operated by individuals fleeing police officers, crashed into vehicles occupied by innocent parties. Under *Fiser*, if the police pursuit constitutes negligent operation of the police vehicle, then the motor vehicle exception applies[1] and the municipality is not immune from tort liability. *Fiser, supra* at 469.

The motor vehicle exception to governmental immunity allows a governmental agency to be held

---

[1] MCL 691.1405; MSA 3.996(105).

liable for its employee's negligent operation of a government-owned vehicle. MCL 691.1405; MSA 3.996(105) states in pertinent part:

> Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner . . . .

In *Ewing v Detroit (On Remand)*,[2] defendants appeal from a decision of the Court of Appeals that reversed the trial court's grant of summary disposition in their favor. The Court of Appeals held that plaintiffs in that personal injury case had presented sufficient evidence to raise genuine issues of fact regarding negligence and proximate causation.

However, defendants contend that the conduct of the police officers cannot be a proximate cause of plaintiffs' injuries. They argue that the Court of Appeals erred in reversing the trial court's decision, because plaintiffs had failed to present a prima facie case of negligence. We disagree with defendants.

Rather, we adopt the reasoning outlined by Justice RYAN in his concurrence in *Fiser* at 479-480. Justice RYAN stated, "It is for the factfinder to determine whether the actions of the operators of the pursuing vehicles were causes in fact of the plaintiff's injuries." *Id.* at 479. Thus, we hold that the high-speed pursuit of the McGuigan vehicle by the police may have proximately caused or proximately contributed to the injuries plaintiffs allege.

---

[2] 214 Mich App 495; 543 NW2d 1 (1995).

The appeal in *Rogers* arises out of a wrongful death suit in which the jury awarded $6,132,993 in favor of the widow of John Rogers.[3] Defendants argue that they can be held liable for no more than the officers' negligent operation of their vehicle, not for their decision to commence or continue pursuit. They claim that the Court of Appeals erred in affirming the trial court's decision that allowed plaintiff to proceed to trial on theories of liability because they are barred by governmental immunity. We disagree.

We find that the trial court did not err in admitting evidence pertaining to defendants' police-pursuit policies. Under *Fiser*, a police officer must exercise reasonable care[4] and may exceed the speed limit only "so long as he does not endanger life or property."[5] *Id.* at 471. Accordingly, we find that the trial court correctly denied defendants' motion for directed verdict.

In *Rogers*, we granted leave to appeal, not only on the immunity issue, but also on issues concerning the verdict itself and various errors alleged to have occurred at trial. We also granted plaintiff's cross-application on the issues of apportionment of fault and collateral source setoffs. We affirm the decision of the Court of Appeals regarding the misconduct issues, but reverse it concerning the apportionment of fault and collateral source setoffs.

We recognize that innocent people are endangered by police pursuits of fleeing vehicles. Also the Legisla-

---

[3] Unpublished opinion per curiam of the Court of Appeals, issued June 23, 1995 (Docket Nos. 157394, 165659).

[4] *Id.* at 470, quoting *McKay v Hargis*, 351 Mich 409, 418; 88 NW2d 456 (1958).

[5] MCL 257.603(c)(3); MSA 9.2303(c)(3).

ture has not taken steps to statutorily overturn our decision in *Fiser*. Consequently, we adhere to the principle of stare decisis and uphold the rule as articulated in that case.

FACTS

*EWING v DETROIT*

On November 29, 1990, thirty-seven-year-old Deborah Ewing was driving a van through her residential neighborhood in northwest Detroit. Her four-year old daughter, Krystal, was with her. Ms. Ewing was eastbound on Florence going twenty to twenty-five miles an hour. She slowed as she approached the intersection of Florence and Shaftsbury, an "open" residential intersection three blocks south of McNichols.

As she entered the intersection, a 1985 Dodge Ram pickup truck broadsided her van. The truck had been traveling southbound on Shaftsbury at a high rate of speed, variously estimated at sixty to seventy and ninety to one hundred miles an hour. It was driven by Jay McGuigan who, at the time, was fleeing police officers.

As a result of the collision, both vehicles were rendered nondriveable. Mr. McGuigan fled from his vehicle on foot, but was chased, apprehended, and arrested by police officers. Ms. Ewing was rendered unconscious. Both she and her daughter suffered severe injuries.[6]

---

[6] Ms. Ewing's injuries included facial lacerations, a scalp wound, closed head injury with brain damage, speech impairment, visual disturbances, cognitive impairment and memory loss, multiple left rib fractures, collapsed lungs, bleeding into the spleen, and renal contusions. Although the

The facts surrounding the police chase are as follows: Officer Michael Malott worked in the Detroit Police ministation section as part of a backup arrest unit for a surveillance crew. He was alone in a car designated as the "scout car." The car was without police markings, but was equipped with red and blue grille lights, rear deck lights, and a siren. Several other surveillance units were nearby. They were manned by Officers Dettore, Robbins, and White. The units were conducting a surveillance of a known stolen pickup truck parked in a driveway on Margareta in a residential neighborhood.

The cars and their backups were in closed-channel radio communication with one another. When Officer White radioed to the others that the pickup truck was occupied and moving, they replied that they were going to stop the stolen vehicle. Officer Malott began to drive to the location to assist in the arrest. However, before he arrived, he learned that the driver of the pickup truck had escaped[7] and was being chased by another unit.

A high-speed chase ensued down Shaftsbury through single-family residential neighborhoods. The pursued vehicle and, at times, the chasing police vehicle disregarded traffic signs and signals. Eventually, the pursuit ended with the collision of the pickup truck and the van driven by Ms. Ewing. Testimony

---

record shows that her daughter was seriously injured, it does not disclose the extent of her injuries.

[7] After the stolen pickup departed, Officer White radioed Officer Robbins. Near the intersection of West Seven Mile and Sunderland, Officer Robbins encountered the truck. At West Seven Mile and Warwick, he stopped it. Mr. McGuigan opened the driver's door of the pickup truck as if to get out. Suddenly, he slammed the door, drove across oncoming traffic, and fled south on Shaftsbury.

established that the police vehicle was approximately one-half block away at the time of collision.

Ms. Ewing brought suit against the defendant, city of Detroit, and its police officers, pleading negligent operation of government vehicles and gross negligence on the part of the individual police officers. Defendants filed a third-party complaint against Mr. McGuigan.

The city moved for summary disposition against Ms. Ewing, alleging governmental immunity and failure by plaintiffs to state an actionable claim and a dispute of fact submittable to a jury. The trial court granted summary disposition in favor of the city on both counts.

Plaintiffs appealed to the Court of Appeals. The panel[8] peremptorily reversed the summary disposition in favor of the city and its police department, but affirmed summary disposition in favor of the individual police officers.

The city then appealed to this Court. We issued a remand order on May 2, 1995. 448 Mich 928. It stated:

In lieu of granting leave to appeal, the portion of the July 6, 1994, order of the Court of Appeals reversing the grant of summary disposition to the defendants city of Detroit and Detroit Police Department is vacated, and the case is remanded to that Court for plenary consideration only of the portion of plaintiff's appeal from the Wayne Circuit Court's order granting summary disposition to those defendants on plaintiff's theory under MCL 691.1405; MSA 3.996(105).

On remand, the Court of Appeals again reversed the trial court's grant of summary disposition to the

---

[8] DOCTOROFF, C.J., and MURPHY and FITZGERALD, JJ.

city and its police department. Defendants appealed to this Court and we granted defendants' application for leave to appeal.[9]

### ROGERS v DETROIT

This appeal arises out of a wrongful death suit in which the jury awarded $6,132,993 in favor of plaintiff. On June 17, 1988, John Rogers[10] was driving his automobile west on Jefferson approaching Lemay. He was fatally injured when another vehicle that had been speeding on Lemay struck his vehicle. The driver of the other vehicle was fourteen-year-old Keith Montgomery, an unlicensed driver who was attempting to flee from Detroit police officers chasing him in their car. Mr. Montgomery allegedly had failed to stop at the intersection of Lemay and Kercheval.

Plaintiff brought suit against the city, its police department, and the police officers who undertook the pursuit. She claimed that the pursuit constituted a hazard and that the city and its police officers were liable for the death of her husband because of their negligence. They included the commencement and continuation of the pursuit, inadequate selection and training of officers, and failure to promulgate proper policies regarding vehicular pursuits. The allegations also stated that Mr. Montgomery was liable because of his negligent operation of the car. Plaintiff did not pursue the suit against him, presumably because he

---

[9] 454 Mich 863 (1997).

[10] At the time of Rogers' death, his wife, Carol, was pregnant. She later gave birth to a baby girl. As a result of the death, which arose out of the use of a motor vehicle and in the course of her husband's employment, workers' compensation, social security, and uninsured motorist benefits were paid.

was an uninsured minor and uncollectible at the time of the accident.

Pursuant to MCR 2.206,[11] the city filed a motion to join Montgomery as a party-defendant. They asked the circuit court to retain him as a defendant by requiring plaintiff to serve him with a summons and copy of the complaint.

At a settlement conference, the circuit court stated that it could not force plaintiff to proceed against Mr. Montgomery. It allowed plaintiff to dismiss him as a defendant, thereby denying the city's motion. However, the court allowed Mr. Montgomery to be added as a third-party defendant, because it recognized the city's desire and right to secure a statutory apportionment of damages. Mr. Montgomery was then added as a third-party defendant only for the purpose of apportioning the city's liability. MCL 600.6304; MSA 27A.6304.

The trial commenced on April 6, 1992, and ended on April 15, 1992, with the jury returning a verdict[12] in favor of plaintiff. It found that defendants had been negligent and that the negligent operation of the police car was the cause of John Rogers' death. Damages were assessed in the amount of $6,132,993. The jury apportioned fault, eighty percent to the city and twenty percent to Montgomery. Because Montgomery was uncollectible, the circuit court held that the city was responsible for payment to plaintiff of the entire verdict.

---

[11] MCR 2.206 is the rule pertaining to permissive joinder of parties.

[12] The jury was given a special verdict form that asked whether the plaintiff's death had been the result of the negligent operation of the police car. The jury answered "yes."

The city then requested a new trial. The court denied the motion, but granted an evidentiary hearing on the question whether plaintiff and the third-party defendant had cooperated at trial.

After the hearing, the court denied the remainder of the city's motion. It heard plaintiff's later motion for entry of judgment and allowed plaintiff's counsel ten days from the entry of judgment to notify contractual lienholders of the verdict. The order was notwithstanding statutory language requiring plaintiff's counsel to notify lienholders within ten days of the verdict. MCL 600.6303(3); MSA 27A.6303(3).

Another hearing was held at which defendant sought a statutory collateral source setoff, requesting that the judgment be reduced by $1,050,440. The court refused. Instead, it ordered that the disputed amount be placed in escrow when the judgment was paid. The court entered judgment without reducing the city's liability by the twenty percent for which Montgomery was liable and without giving defendant the benefit of the collateral source setoffs. The city appealed to the Court of Appeals.

On appeal, the Court of Appeals affirmed the judgment, but ordered a remand with the direction that the court apportion the judgment pursuant to the verdict and allow collateral source setoffs. Plaintiff now appeals from that decision.

In addition to defendants' *Fiser* claim, defendants also appeal from the Court of Appeals decision that refused to grant a new trial on the basis of various alleged errors perpetuated at trial. We granted defend-

ants' application for leave to appeal and plaintiff's application for leave to appeal as cross-appellant.[13]

In *Fiser, supra,* this Court addressed what immunity is available to a municipality and its police officers from liability for injuries related to an automotive police chase. Specifically at issue was the interpretation and application of the "motor vehicle exception" to immunity. MCL 691.1405; MSA 3.996(105). In the years following *Fiser,* its analysis has dominated and controlled questions of immunity arising from police pursuits.

*Fiser* arose from a high-speed police chase through a residential neighborhood that ended when the fleeing suspect struck the plaintiff's vehicle. This Court unanimously reversed a summary disposition order, holding that the plaintiff's liability claims fell within the motor vehicle exception. MCL 691.1405; MSA 3.996(105).

In each of the cases before us, plaintiffs must prove that (1) defendants owed a duty to plaintiffs, (2) defendants breached that duty, (3) plaintiffs suffered damages, and (4) defendants' breach of duty or negligence was a proximate cause of plaintiffs' damages. *Fiser, supra* at 469-470.

Defendants have a duty to exercise toward plaintiffs that care that a reasonably prudent person would exercise while discharging official duties of a similar nature under similar circumstances. *Fiser, supra* at 470, quoting *McKay v Hargis,* 351 Mich 409, 418; 88 NW2d 456 (1958). When applying that standard, a

---

[13] 453 Mich 951 (1996).

court considers the statutes governing operation of emergency vehicles. MCL 257.603; MSA 9.2303,[14] MCL 257.632; MSA 9.2332.

Those statutes provide:

(b) The driver of an authorized emergency vehicle when responding to an emergency call, but not while returning from an emergency call, may exercise the privileges set forth in this section, subject to the conditions of this section.

(c) The driver of an authorized emergency vehicle may:

(1) Park or stand, irrespective of the provisions of this act.

(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation.

(3) Exceed the prima facie speed limits *so long as he does not endanger life or property.*

(4) Disregard regulations governing direction of movement or turning in specified direction.

(d) The exemptions granted in this section to an authorized emergency vehicle shall apply only when the driver of the vehicle while in motion sounds an audible signal by bell, siren, air horn, or exhaust whistle as may be reasonably necessary except as provided in subsection (e), and when the vehicle is equipped with at least 1 lighted lamp displaying a flashing, oscillating, or rotating red or blue light . . . . [MCL 257.603; MSA 9.2303 (emphasis added).]

The speed limitation set forth in this chapter shall not apply to vehicles when *operated with due regard for safety* under the direction of the police when traveling in emergencies *or* in the chase or apprehension of violators of the law or of persons charged with or suspected of a violation, nor to fire department or fire patrol vehicles when traveling in response to a fire alarm, nor to public or private ambu-

[14] After the accident, the statute was amended, effective June 1, 1997. We do not consider here changes in the Tort Reform Act that may affect future police-pursuit litigation.

lances when traveling in emergencies. . . . *This exemption shall not however protect the driver of the vehicle from the consequences of a reckless disregard of the safety of others.* [MCL 257.632; MSA 9.2332 (emphasis added).]

Subsections 603(c)(2) and (3) allow a driver of an emergency vehicle to proceed past stop signals and signs after slowing "as may be necessary for safe operation." The driver may exceed the speed limit "so long as he does not endanger life or property." According to *Fiser*, "[t]he legislative intent is expressed in these statutes—emergency vehicles must be driven with due regard for the safety of others." *Id.* at 472. We infer from this language that a duty to innocent bystanders, onlookers, and travelers does exist.

The *Fiser* Court stressed that abstract policy was not to be considered in cases of this type because the liability in question is statutory in nature. It stated:

> The defendants argue that a reversal of the decision of the Court of Appeals would be contrary to good public policy because it would have a chilling effect on the performance of police officers. Whatever the merits of defendants' argument, it is not for us to decide. The Legislature has determined the public policy embraced in MCL 257.603, 257.632, 691.1405; MSA 9.2303, 9.2332, 3.996(105), and, if the performance of police officers is chilled thereby, undoubtedly the Legislature was satisfied that a higher public good was served by enacting the statutes. Even if we were persuaded that the policy is unwise, we would not be free to change it. [*Id.* at 475-476.]

*Fiser*'s deference to the Legislature did not go unnoticed by lobbyists for municipalities. In the wake of *Fiser*, House Bill 4003 was proposed. It would have amended § 5 of 1964 PA 170 and was described as:

An act to make uniform the liability of municipal corpora-
tions, political subdivisions, and the state, its agencies and
departments, when engaged in the exercise or discharge of
a governmental function, for injuries to property and per-
sons; to define and limit this liability; to define and limit the
liability of the state when engaged in a proprietary function;
to authorize the purchase of liability insurance to protect
against loss arising out of this liability; to provide for
defending certain claims made against public officers and
paying damages sought or awarded against them; to provide
for the legal defense of public officers and employees; to
provide for reimbursement of public officers and employees
for certain legal expenses; and to repeal certain acts and
parts of acts, being section 691.1405 of the Michigan Com-
piled Laws.

The Legislature rejected House Bill 4003, and, in
the 1986 revisions of the governmental immunity stat-
ute, retained the language of MCL 691.1405; MSA
3.996(105) that was interpreted in *Fiser.*

Against this backdrop, we reject defendants'
request to overrule *Fiser.* Here, the statutory meaning
is clear on its face. Therefore, the role of the judiciary
is not to articulate its view of "policy," but to apply
the statute in accord with its plain language. *Lorencz
v Ford Motor Co,* 439 Mich 370, 376; 483 NW2d 844
(1992). Also, where legislation has been authorita-
tively construed by the courts, then retained by the
Legislature, we will find legislative concurrence. *Mar-
greta v Ambassador Steel Co,* 380 Mich 513, 520; 158
NW2d 473 (1968).

Defendants argue that *Fiser* was overruled sub
silentio by *Ross v Consumers Power Co (On Rehear-
ing),* 420 Mich 567; 363 NW2d 641 (1984). We
disagree.

The contention that *Fiser* was overruled misappre-
hends the meaning of *Ross.* The "discretion-

ary/ministerial" test of *Ross* applied only to the common-law liability of individual employees, not to the statutory liability of governmental agencies. *Ross* held that neither that decision nor MCL 691.1407; MSA 3.996(107) detracts from a city's liability under MCL 691.1405; MSA 3.996(105), as applied to police pursuits in *Fiser. Ross, supra* at 591,[15] 593-594,[16] 620-622.[17]

We find that *Ross* could not and did not overrule *Fiser.* Thus, we conclude that *Fiser* remains good law in Michigan, and that the proofs under each of the cases at hand establish a cause of action submittable to a jury.

Our decision in *Fiser* expressly states that claims of negligence and proximate cause are to be submitted to and decided by a trier of fact and not by summary disposition. *Id.* at 471-476. Defendants, having failed to distinguish their cases from *Fiser,* have not persuaded us to overrule our decision in *Fiser.*

We further decline to narrow our findings in *Fiser* and believe that any limitation in liability must come from the Legislature.

---

[15]   All governmental agencies (state and local) are vicariously liable for the negligent operation of government-owned motor vehicles by their officers, employees, and agents (MCL 691.1405; MSA 3.996[105]).

[16]   All governmental agencies, both state and local are statutorily liable for bodily injury and property damage arising out of . . . the negligent operation of a government-owned motor vehicle by the agency's officer, agent, or employee . . . .

[17]   The "motor vehicle" exception in § 5 is the only instance where a governmental agency is explicitly held vicariously liable for the negligent actions of its officers, employees, and agents.

As *Ross* recognizes, the standard of liability under MCL 691.1405; MSA 3.996(105) is simply that of negligence.

APPLICATION OF LAW

*EWING v DETROIT*

In *Ewing,* defendants are emboldened in their proximate causation analysis by the Court of Appeals criticism leveled against *Fiser* in *Ewing* and *Frohman v Detroit,*[18] 181 Mich App 400; 450 NW2d 59 (1989). Both the *Ewing* and the *Frohman* Court of Appeals panels expressly followed *Fiser,* but each criticized *Fiser's* proximate causation analysis. In neither was the criticism unanimous. We are not persuaded by the criticism to alter our *Fiser* analysis.

Defendants attempt to draw support for their argument by relying on three other Michigan Court of Appeals police-pursuit decisions: *Cooper v Wade,* 218 Mich App 649; 554 NW2d 919 (1996); *Robinson v Detroit (On Rehearing),* 225 Mich App 14; 571 NW2d 34 (1997); *Jackson v Oliver,* 204 Mich App 122; 514 NW2d 195 (1994). However, we find these cases distinguishable from the cases before us.

*Fiser, Frohman,* and *Ewing* all involve tort actions brought by injured innocent bystanders during police pursuits, *Jackson, Cooper,* and *Robinson* involve actions brought by the operators or passengers of pursued vehicles. The latter cases dealt not with proximate causation, but with the issue of duty.

We reject the conclusion that, under the tragic facts of *Ewing,* it was, as a matter of law, the felon's flight not the officers' pursuit that proximately caused plaintiffs' injuries. In *Turner v Auto Club Ins Ass'n,*[19]

---

[18] *Frohman* involves the same type of police pursuit as *Fiser.*

[19] 198 Mich App 650; 499 NW2d 434 (1993), rev'd 448 Mich 22; 528 NW2d 681 (1995).

this Court addressed a similar question in a no-fault property protection insurance case.

*Turner* involved a police chase accident. As in *Ewing*, there was no physical contact between the pursuing police car and any of the colliding vehicles. We reversed a Court of Appeals decision that held that the accident resulted not from police use of a vehicle, but from the thief's act of fleeing the police. *Turner, supra* at 42-43. We stated that "the use of the police vehicle as a motor vehicle had an active link with the damage, making it 'involved in the accident'. . . ." *Id.* at 43. Thus, the police car was partly responsible. *Id.*

Therefore, we find *Turner* consistent with *Fiser* and conclude that there is nothing inimical about *Fiser*'s analysis and the application of established proximate causation principles to police-pursuit cases.

There may be more than one proximate cause of an injury. Hence, if the facts are as alleged, the negligent conduct of Mr. McGuigan, and the negligent conduct of the police officers both were proximate causes of plaintiffs' injuries. That Mr. McGuigan may have been an intervening agent would not absolve the city and its police department from liability. As stated in 2 Restatement Torts, 2d, § 447, p 478, and in *Fiser, supra* at 479-480:

> The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

Thus, *Fiser* remains consistent with the Restatement and its established proximate causation principles. Moreover, ours is among the growing majority of jurisdictions recognizing that police pursuits can be the proximate cause of injuries to innocents and that proximate causation is a question for the jury. See, e.g., *Carl v City of Overland Park, Kansas*, 65 F3d 866, 875 (CA 10, 1995); *Haynes v Hamilton Co*, 883 SW2d 606, 612 (Tenn, 1994).

The *Fiser* Court has articulated several factors to be considered when evaluating the reasonableness of a police officer's conduct in a police-pursuit situation. They are: (1) whether there was an emergency, (2) the speed of the pursuit, (3) the area of the pursuit, (4) the weather and road conditions, (5) the presence of pedestrians and other traffic, (6) the presence or absence of audible and visible warnings, and (7) the reason the officers were pursuing the fleeing vehicle. *Id.* at 472.

Taking these factors into account, we found in *Fiser* issues for the jury of negligence and proximate causation where the police-pursuit situation involved: (1) high speed, (2) disregard of traffic signals, (3) pursuit through residential and business areas, and (4) a wet pavement at a well-traveled intersection. *Id.* at 472-473.

In the present case, the situation is similar. A high-speed chase took place: (1) across busy major city streets, (2) through densely populated urban residential areas, (3) during a time of day when schools released children, (4) in disregard of traffic and traffic signals, (5) by not fully marked police vehicles, (6) in violation of internal police standards, and (7) in pursuit of a stolen vehicle that the police had been surveilling.

Plaintiffs have pleaded facts in *Ewing* sufficient to state an actionable claim, including facts in avoidance of immunity. There exists a genuine issue of material fact concerning whether the officers were negligent and, if negligent, proximately caused plaintiffs' injuries. Therefore, we find that the Court of Appeals correctly reversed the trial court's grant of summary disposition for defendants. We affirm the decision and remand *Ewing* for trial.

### *ROGERS v DETROIT*

#### GOVERNMENTAL IMMUNITY

In *Rogers*, defendants contend that the trial court erred by allowing plaintiff to proceed to trial on theories of liability that were barred by governmental immunity. The trial court allowed plaintiff to challenge the police officers' familiarity and compliance with the department's policies regarding chases. It also permitted jury consideration of whether the officers were negligent when they decided to continue the pursuit of Mr. Montgomery.[20] Defendants

---

[20] While undertaking the high-speed police pursuit, the police officers failed to display an audible signal. Looking at the facts of *Rogers*, we believe that it is not a case where the audible signal exception should have been invoked. MCL 257.603(e); MSA 9.2303(e).

claim that governmental immunity applied to all acts of their officers, except those stemming from the negligent operation of a motor vehicle. They argue that they could not be held liable for the officers' decision to commence or continue the pursuit. We disagree with defendants.

After *Fiser*, it is clear that, if a police pursuit constitutes negligent vehicular operation, then the motor vehicle exception applies and the municipality is not immune from tort liability. *Fiser, supra* at 469. Therefore, the jury's finding of negligence on the part of defendants was reasonable if based on (1) the unduly high chase speeds reached by the police vehicle, (2) on congested residential and commercial city streets, and (3) when the officers failed to operate their siren and overhead lights.

We find it appropriate that the jurors were instructed to consider the police department policy, the officers' knowledge of the policy, the applicable statutes, and their own everyday experience. The department policy was relevant. Defendants did not object to its admission. It was therefore properly admitted and properly used.

Accordingly, we find that the trial court correctly denied defendants' motion for a directed verdict.

ALLEGED ATTORNEY MISCONDUCT

Defendants claim that repeated and extensive misconduct by plaintiff's counsel during closing argument diverted the jury from the primary issues of the case and denied defendants a fair trial. We disagree.

This Court stated in *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982):

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

The first asserted improper conduct by plaintiff's counsel is his characterization of defense counsel to the jury as "slick," a "slick talker," "smooth," and "smoothtalking." Plaintiff responds that all these comments were responses to argument by defendants.

Plaintiff's counsel may have been attempting to persuade the jury that defense counsel was not being truthful in some of his arguments. However, we disagree that this constituted trial misconduct. Moreover, defendants did not object to the comments.

We agree with the Court of Appeals that the verdict was not changed by plaintiff's counsel's references to defense counsel. Plaintiff's case was very strong. Counsel presented convincing evidence that the two police officers undertook a police chase that was improper and negligent. The jury believed plaintiff's counsel and, we conclude, would have ruled for plaintiff as it did, irrespective of counsel's disparaging remarks.

At the same time, we discourage any attorney from denigrating another before a jury. Such behavior jeopardizes the integrity of a trial and reflects adversely on the legal profession. Language unbecoming a court officer imperils the decorum that courts must maintain.

The second challenged error is plaintiff's counsel's reference to facts not in evidence. During rebuttal argument, plaintiff's counsel read from a portion of Mr. Montgomery's deposition not in evidence to rebut the claim that Montgomery had changed his testimony.

Although it was improper for counsel to read the testimony, defendants again failed to object. If defense counsel had objected, then the trial court could have immediately instructed the jury. On the basis of defendants' failure to object and a lack of manifest injustice, we decline to reverse the trial court's decision not to set aside the jury verdict.

Defendants object also to plaintiff's counsel's placement on one of plaintiff's exhibits of the letter B. It appeared on a large street chart showing the area traversed by the police chase.

During closing argument, defense counsel questioned the meaning of the B. During rebuttal, plaintiff's counsel responded that he had placed the letter on the diagram to designate the point at which the police could have stopped their chase. Defendants objected.

The assertion that the B stood for the point at which the police should have discontinued their chase was first raised during closing argument. Plaintiff asserts that, because plaintiff's counsel prepared

the exhibit, he was entitled to explain the placement of the letter. We agree.

Defense counsel made the marking on the chart a prominent theme of his closing argument. Thus, plaintiff's counsel's explanation of it should not be viewed as evidence. Moreover, the judge instructed the jury that the attorneys' arguments were not to be considered evidence. Therefore, we find no error.

Next, defendants assert that plaintiff's counsel made comments during his closing and rebuttal arguments that inappropriately appealed to the sympathy of the jury. Whereas an appeal to the jury's sympathy may constitute grounds for reversal, the resultant prejudice can be cured by an instruction. The jury can be advised that its verdict must not be influenced by sympathy. *Jakubiec v Hasty*, 337 Mich 205; 59 NW2d 385 (1953).

In *Rogers*, defendants neither objected to plaintiff's counsel's remarks nor requested an instruction. Moreover, the trial judge instructed the jury that "[s]ympathy must not influence your decision." Thus, we decline to reverse on this ground.

The conduct of plaintiff's counsel that defendant complains of in *Rogers* does not warrant a new trial. We find that it was the proofs, not the challenged argument, that led the jury to find the city liable.

THE ALLEGED RELATIONSHIP BETWEEN
MR. MONTGOMERY AND PLAINTIFF

When plaintiff filed suit, he named Mr. Montgomery as a defendant. However, Montgomery was never served, and plaintiff did not proceed against him as a first-party defendant.

Defense counsel then sought leave to file a third-party complaint against Montgomery. Plaintiff expressed concern that Montgomery was appearing without counsel and referred him to attorney Sheldon Miller.[21]

During trial, defense counsel raised questions about the relationship between plaintiff's counsel and Montgomery's counsel. The trial judge stated that he would allow the defense to question Montgomery about his relationship with plaintiff and plaintiff's counsel. However, for whatever reason, the defense chose to pose no questions.

Defendants now contend that they were denied a fair trial because counsel for plaintiff and Montgomery entered into a *"Mary Carter"*[22] agreement. In *Smith v Childs*,[23] the Court of Appeals stated:

> The distinguishing characteristics of a *Mary Carter* agreement are that it (1) not act as a release, so the agreeing defendant remains in the case, (2) is structured in a way that it caps the agreeing defendant's potential liability and gives that defendant an incentive to assist the plaintiff's case against the other defendants, and (3) is kept secret from the other parties and the trier of fact, causing all to misunderstand the agreeing defendant's motives.

---

[21] Mr. Miller agreed to represent Mr. Montgomery pro bono. Miller's son was a law clerk for plaintiff's counsel.

[22] The term *"Mary Carter* Agreement" as defined by Black's Law Dictionary (6th ed) arises from the agreement popularized by the case of *Booth v Mary Carter Paint Co*, 202 So 2d 8 (Fla App, 1967). It refers to an agreement between the plaintiff and some, but fewer than all, defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants. The extent of responsibility is usually in inverse ratio to the amount the plaintiff is able to recover against the nonagreeing defendant or defendants. In certain states, such agreements are void as against public policy, while, in others, they are permissible if disclosed to the jury.

[23] 198 Mich App 94; 497 NW2d 538 (1993).

*Mary Carter* agreements deny a fair trial to those defendants who are not part of the agreement. *Smith v Childs, supra* at 97-98.

While the record may raise questions regarding the relationship between plaintiff's counsel and Montgomery's counsel, there is no direct evidence that a *Mary Carter* agreement was ever established. Defendants have failed to demonstrate that an agreement existed that capped Montgomery's liability as an incentive for him to assist plaintiff in her case against defendants. Thus, the argument that such an agreement denied defendant a fair trial fails.

### EVIDENTIARY RULINGS

Defendants also argue that the trial court erred in admitting several items of evidence denying them a fair trial. We find that the trial court properly admitted the evidence in question, including the photographs, videotape, and deposition testimony of a party.

After the trial had commenced, one of plaintiff's expert witnesses visited the scene of the accident, took photographs, and shot a videotape. These items were introduced into evidence over the objections of defense counsel. The photographs and the videotape were relevant. They showed the jurors the geographical layout of the area, the length and width of the street, and the configuration of the intersection. Plaintiff did not purport, as defendants argue, that this evidence was a representation of how the streets appeared when the incident occurred, merely their layout. Therefore, defendants' argument is misplaced.

We find that *Stuive v Pere Marquette R Co*,[24] is on point. In *Stuive*, the Court held that, when it is admitted that relevant evidence did not show conditions on the date of the accident, there is no error in its admission. *Id.* at 154. Therefore, we find that the photographs and videotape were properly admitted.

Regarding the deposition testimony of Officer Jackson, the trial judge allowed plaintiff to read into evidence certain portions of his testimony. The ruling was not erroneous because the deposition testimony constituted an admission by a party defendant. Thus, it is not barred by MRE 801(d)(2).

### APPORTIONMENT OF THE VERDICT

#### A. WEIGHT OF EVIDENCE

Defendants argue that the finding of the jury that the city was eighty percent and Montgomery was twenty percent at fault was against the great weight of the evidence. We disagree.

To make its decision, the jury must weigh the testimony of the witnesses and determine their credibility. *Johnson v Corbet*, 423 Mich 304, 314; 377 NW2d 713 (1985).

The testimony at trial was that Montgomery's initial offense was minor; he had squealed his tires before making a rolling stop at a stop sign. Both pursuing police officers testified that they did not learn that the Montgomery automobile had been stolen until after the pursuit terminated. In addition, the testimony showed that the police officers were supposed to, but failed to, activate their lights and siren when engaging in the automobile pursuit. The purpose of

---

[24] 311 Mich 143; 18 NW2d 404 (1945).

the requirement is to warn other motorists, such as Rogers, of the chase. When Montgomery accelerated in a residential area during rush-hour, the officers sped up to continue the chase rather than discontinuing it.

The jury was entitled to conclude from that evidence that the city was eighty percent at fault. Therefore, we affirm the Court of Appeals in this regard.

### B. AMOUNT OF DAMAGES

Plaintiff Rogers alleges that the Court of Appeals misconstrued MCL 600.6304; MSA 27A.6304[25] when it limited the city's liability to paying no more than eighty percent of the verdict. Montgomery was uncollectible. Consequently, plaintiff argues, the statute requires that the city be liable for an additional amount, eighty percent of Montgomery's uncollectible twenty percent. We agree and reverse the Court of Appeals holding that the city was liable for none of Montgomery's twenty percent.

The statute required that, in rendering a verdict, the judge or jury determine what percentage of fault is ascribable to each party.[26] At subsection 7, it stated:

---

[25] When the *Rogers* claim accrued, the applicable statute was 1986 PA 178. It has since been amended by 1995 PA 249.

[26] (1) In a personal injury action involving fault of more than 1 party to the action, including third-party defendants, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:

(a) The total amount of each plaintiff's damages.

(b) The percentage of the total fault of all of the parties regarding each claim as to each plaintiff, defendant, and third-party defendant.

(2) In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation

Notwithstanding subsection (3),[27] a governmental agency, other than a government or medical care facility, shall not be required to pay a percentage of any uncollectible amount that exceeds the governmental agency's percentage of fault as determined under subsection (1). [MCL 600.6304(7); MSA 27A.6304(7).]

The expression "a percentage of any uncollectible amount that exceeds the [defendant's] percentage of fault as determined under subsection (1)" appears also in subsection 6. There, the meaning of the language is clear: Where a party's share of the obligation is uncollectible from that party, it may be reallocated among the other parties according to their respective percentages of fault. Each must then pay a percentage of the uncollectible amount equal to its own percentage of fault.

We conclude that the language in subsection 6, which is repeated in subsection 7, has the same meaning in both subsections. We find it incredible that the Legislature would use the same language in two successive sections to carry different meanings.

It is apparent that subsection 7 was included in the statute to limit the liability of governmental agencies, excepting hospitals and health care facilities. Without it, a governmental agency could be liable for as much as one hundred percent of any uncollectible amount. That is because subsections 5 and 6, which limit a party's liability for an uncollectible amount to its per-

---

between the conduct and the damages claimed. [MCL 600.6304(1), (2); MSA 27A.6304(1), (2).]

[27] Subsection 3 states:

If it is determined under subsections (1) and (2) that a plaintiff is not at fault, subsections (5) and (6) shall not apply.

centage of fault, do not apply where the plaintiff is not at fault.

In the present case, the jury found the plaintiff to be not at fault. Consequently, subsection 7 serves to apply the same liability and limitation of liability to the city as subsections 5 and 6 would have applied had plaintiff been at fault. This is evidenced by the Legislature's use, in subsection 7, of the same language as appears in subsection 6.

Thus, we reverse the Court of Appeals decision regarding the apportionment of the verdict and hold that the city does bear a reallocation burden equal to its initial percentage of fault. The city is liable for eighty percent of the verdict plus eighty percent of the twenty percent ascribed to defendant Montgomery.

### STATUTORY SETOFFS TO THE COLLATERAL SOURCE RULE

Plaintiff recovered from collateral sources, including worker's compensation, uninsured motorist carrier, and social security. The collateral source setoff rule, MCL 600.6303(1); MSA 27A.6303(1), states in pertinent part:

> In a personal injury action in which the plaintiff seeks to recover for the expense of medical care, rehabilitation services, loss of earnings, loss of earning capacity, or other economic loss, evidence to establish that the expense or loss was paid or is payable, in whole or in part, by a collateral source shall be admissible to the court in which the action was brought after a verdict for the plaintiff and before a judgment is entered on the verdict. Subject to subsection (5), if the court determines that all or part of the plaintiff's expenses or loss has been paid or is payable by a collateral source, the court shall reduce that portion of the judgment which represents damages paid or payable by a

collateral source by an amount equal to the sum determined
pursuant to subsection (2). This reduction shall not exceed
the amount of the judgment for economic loss or that por-
tion of the verdict which represents damages paid or paya-
ble by a collateral source.

Under subsection 6303(2), before judgment is
entered, the trial court must determine what
expenses have been paid or will be paid by a collat-
eral source. The paid expenses are then applied to
reduce the economic damages component of the ver-
dict. Under subsection 6303(3),[28] the plaintiff has ten
days to notify all contractual lienholders of the ver-
dict, and then the lienholders have an allocated time
to exercise or lose their subrogation rights.

In *Rogers*, plaintiffs did not notify all contractual
lienholders within ten days of the verdict. They
claimed to have given notice before the verdict.
Defendants sought setoffs, but the trial court refused
them and granted plaintiffs leave to notify contractual
lienholders within ten days of the judgment.

Nothing in MCL 600.6303(3); MSA 27A.6303(3)
expressly forbids a trial judge from extending the
period or recognizing "notice" occurring before the
verdict. The judge did not abuse his discretion in this
case. The statute also does not deprive a trial court of
the authority to recognize that substantial compliance
occurred in this case. The law does not require that a

---

[28]  Within 10 days after a verdict for the plaintiff, plaintiff's attor-
ney shall send notice of the verdict by registered mail to all per-
sons entitled by contract to a lien against the proceeds of plaintiff's
recovery. If a contractual lien holder does not exercise the lien
holder's right of subrogation within 20 days after receipt of the
notice of the verdict, the lien holder shall lose the right of subroga-
tion. This subsection shall only apply to contracts executed or
renewed on or after the effective date of this section.

lienholder lose its substantive rights. It does not provide a tortfeasor with a windfall, just because lien rights were exercised at a different time than within the statutory ten-day window.

A statute is to be construed to avoid inflicting hardship or reaching an unjust or unreasonable result. *Franges v General Motors Corp*, 404 Mich 590, 612; 274 NW2d 392 (1979). Here, we conclude that the overall statutory purpose was fulfilled: to avoid giving plaintiff either a double recovery or a double liability. To that end, the spirit and purpose of the legislation must prevail over the strict letter of the law. *State Treasurer v Wilson*, 423 Mich 138, 144; 377 NW2d 703 (1985).

Therefore, we reverse the decision of the Court of Appeals and hold that the circuit court properly ruled concerning the collateral source rule.

CONCLUSION

We decline to overrule or modify our decision in *Fiser*. When legislative enactments are clear on their face, the role of the judiciary is not to articulate its view of policy, but to apply the statutes in accord with their plain language. *Lorencz, supra*. We conclude that any limitation in liability in police chase cases must come from the Legislature.

Thus, on the basis of *Fiser*, we affirm the decision of the Court of Appeals in *Ewing* and hold that summary disposition was improperly granted to defendants. In *Rogers*, we affirm the Court of Appeals decision regarding all aspects of the case, including the governmental immunity claim. However, we reverse the Court of Appeals decision regarding the apportionment issue and the collateral source statute. The

city is liable for eighty percent of the verdict plus
eighty percent of the twenty percent ascribed to
defendant Montgomery. Any outstanding liens will be
satisfied upon the payment of the judgment to ·
plaintiff.

MALLETT, C.J., and BRICKLEY and CAVANAGH, JJ., con-
curred with KELLY, J.

TAYLOR, J. (*dissenting*). In these two separate cases,
we are asked to determine whether the city of Detroit
Police Department can be held liable for the death of
John Rogers and the personal injuries of Deborah and
Krystal Ewing. In both cases, police officers
attempted to stop a motorist; the motorist fled and
subsequently caused an automobile accident, killing
or injuring a third-party motorist. In neither case was
the police vehicle physically related to the accident
other than by the fact that it was pursuing the vehicle
that struck the plaintiff's car. Because plaintiffs bring
negligence claims against a governmental entity, they
must establish both an exception to governmental
immunity and each element of a negligence claim in
order to prevail. The majority effectively holds that
the city of Detroit Police Department may be held lia-
ble for the officer's decision to pursue a fleeing
motorist. While I feel compassion for the victims, a
principled application of the law of negligence and
the law of governmental immunity, as it is currently
understood, demonstrates that these plaintiffs are not
entitled to recover from this defendant.

Addressing these issues in turn, I do not believe
that plaintiffs have pleaded a case that demonstrates
an exception to governmental immunity. MCL
691.1407(1); MSA 3.996(107)(1) provides the general

rule: "Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function." The Legislature also codified narrow exceptions to this broad grant of immunity. Plaintiffs contend, and the majority agrees, that the motor vehicle exception, MCL 691.1405; MSA 3.996(105), applies to this case. That section states: "Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner . . . ." Thus, the Legislature decided that governmental entities, such as defendant, could be held liable for the negligent operation of a motor vehicle.

To determine whether that exception applies to these cases, as with all cases addressing governmental immunity, we must start with the fundamental principle recognized by this Court in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 618; 363 NW2d 641 (1984), i.e., the grant of immunity in § 7 is broad, and the exceptions thereto are to be narrowly construed. *Wade v Dep't of Corrections*, 439 Mich 158, 166; 483 NW2d 26 (1992). With this principle foremost in mind, it becomes clear that the decision to pursue a fleeing motorist does not give rise to an exception to governmental immunity. The exception in § 5 applies to the negligent operation of a motor vehicle. A narrow construction of the term "operation of a motor vehicle" would include the manner in which the police vehicle is driven during the pursuit. However, construed narrowly, this exception should not

encompass the decision to pursue a fleeing motorist, which is separate from the operation of the vehicle itself. Thus, I would find no exception to governmental immunity for a claim based on a police officer's allegedly negligent decision to stop or pursue a fleeing motorist.

Counter to this argument, the majority would rely on *Fiser v City of Ann Arbor*, 417 Mich 461; 339 NW2d 413 (1983). In *Fiser*, police officers conducted a high-speed chase that culminated in the suspect's vehicle broadsiding the plaintiff's vehicle, causing the plaintiff severe injuries. This Court, giving a broad reading so as to allow plaintiffs more opportunities to successfully sue municipalities, held that the trial court had erred in granting the defendant's motion for summary disposition on the basis of governmental immunity because, as noted in Justice RYAN's concurrence, "[t]he well-pleaded facts of the plaintiff's complaint establish a jury-submissible question whether Officers Miller and Lunsford operated their police vehicles in a manner which endangered life or property and without due regard for the safety of the plaintiff." *Id.* at 477.

Missing from *Fiser* is the close reasoning that the narrow construction of governmental immunity, which was later adopted by this Court in *Ross*, precipitates. In the post-*Ross* era, there is a need to carefully dissect the actions of the defendant so as to give meaning to the rule of narrow construction. *Fiser* did not so differentiate, and reasonably so, given the approach to the law of governmental immunity that then pertained. We should do so now, as the currently governing doctrine of governmental immunity calls for, and, thus, distinguish between the deci-

sion to pursue and the manner in which the police car was driven during the chase.

The majority would opine that this view "misapprehends the meaning of *Ross*" because "[t]he 'discretionary/ministerial' test of *Ross* applied only to the common-law liability of individual employees, not to the statutory liability of governmental agencies." *Ante* at 140-141. This distinction is a red herring because the Legislature abolished the ministerial versus discretionary test in 1986. *Reardon v Dep't of Mental Health*, 430 Mich 398, 412, n 4; 424 NW2d 248 (1988). The sole issue here is the broadness of governmental immunity and the corresponding narrowness of its exceptions; the ministerial/discretionary side track helps us not at all with that analysis.[1]

---

[1] I presume the reference to the discretionary/ministerial test is an attempt to distinguish that part of *Ross* that stated:

Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. The determination of what type of action to take, e.g., make an immediate arrest, pursue a suspect, issue a warning, await backup assistance, etc., is a discretionary-decisional act entitled to immunity. Once that decision has been made, however, the execution thereof must be performed in a proper manner, e.g., the arrest must be made without excessive force, the pursuit of the suspect must not be done negligently, the request for assistance must include reasonably accurate information, etc. [420 Mich 659-660.]

While the ministerial/discretional analysis is no longer applicable, this passage demonstrates my fundamental point. For purposes of governmental immunity there is an important difference between determining the appropriate course of action and the manner in which that decision is executed. The latter, in this case the manner in which the police car was driven during the chase, would fall under the motor vehicle exception, while the former, the decision to stop the motorist and pursue, does not.

The majority further justifies its reliance on *Fiser* by invoking two notions of legislative acquiescence. First, the majority relies on the garden-variety legislative acquiescence argument, i.e., the Legislature, charged with knowledge of the holding in *Fiser*, should be seen to have implicitly adopted it by its continued silence on this issue. I believe this argument is flawed. Where, as my analysis above makes clear, *Ross* ushered in a new era of narrow reading of exceptions and *Fiser* was a product of the broad-reading era, why would the Legislature have felt a need to do anything about *Fiser*? After all, *Fiser* was, as I would understand it, no longer viable in the new era that *Ross* introduced. Moreover, after *Ross* was decided, the Legislature, pursuant to 1986 PA 175, "put its imprimatur on the broad scope of immunity as defined in *Ross* and, by implication, the narrow scope of the exception[s]." *Reardon v Dep't of Mental Health*, *supra*, 430 Mich 412. Viewed in this manner, I do not think the Legislature implicitly adopted *Fiser* at all.

The majority further justifies its reliance on legislative acquiescence on the basis that a bill was introduced that would have changed the result in *Fiser* and was not adopted. To make this argument, the majority notes that in 1985 House Bill 4003, which would have overruled *Fiser*, was introduced in the House of Representatives. The bill was not passed through either house and, of course, not signed by the Governor. It is uncontested that after being introduced this bill was referred to the Committee on Judiciary, where it languished and died. That is, this bill, one of 1,866 house bills proposed in the 1985-1986 session, was not, as far as we know, considered,

debated, or voted upon by the members of the Committee on Judiciary in the House of Representatives or the full House or the Senate. However, for the majority this scanty history is the stuff of which a successful legislative acquiescence argument can be made. I believe it is an irresponsible use of the dubious doctrine of legislative acquiescence to hold that from these few facts it is permissible to conclude that the legislative body as a whole 1) was aware of this Court's ruling in *Fiser*, 2) was aware of the substance of the introduced bill, 3) compared the two, 4) after careful consideration made its choice, and 5) signaled the result of all this effort by saying nothing. This is remarkable indeed and is perhaps what former Harvard University Law School Professor Thomas Reed Powell meant when he said in discussing legislative acquiescence arguments of this type:

> "[C]ongress has a wonderful power that only judges and lawyers know about. Congress has a power to keep silent. . . . Of course when congress keeps silent, it takes an expert to know what it means. But the judges are experts. They say that congress by keeping silent sometimes means that it is keeping silent and sometimes means that it is speaking." [*Report to the Attorney General, Using and Misusing Legislative History: A Re-Evaluation of the Status of Legislative History in Statutory Interpretation*, U S Dep't of Justice, Office of Legal Policy, January 5, 1989, p 110, n 475, citing Powell, *The Still Small Voice of the Commerce Clause*, in 3 Selected Essays on Constitutional Law 931, 932 (Ass'n of American Law Schools 1938), quoted in Tribe, *Toward a syntax of the unsaid: Construing the sounds of congressional and constitutional silence*, 57 Ind L J 515, 522 (1982).]

I believe that the majority's legislative factual history argument, i.e., the recitation of the introduction of

legislation and its subsequent demise without further consideration by the body, is, as Justice Scalia so aptly said of similar legislative history arguments, "frail substitutes for bicameral vote upon the text of a law and its presentment to the [executive]." *Thompson v Thompson*, 484 US 174, 192; 108 S Ct 513; 98 L Ed 2d 512 (1988). In fact, if such "history" tells us anything, its meaning eludes me. At the very most, it is a "history" that allows the reader, with equal plausibility, to pose a conclusion of his own that differs from that of the majority.[2]

The majority's analysis poses yet a further problem, for it should not be assumed that the Legislature even agrees it has a duty to correct interpretations by the

---

[2] Commentators have noted that one can posit myriad reasons explaining the Legislature's failure to correct an erroneous judicial decision, including:

("Complete disinterest [sic]"; "Belief that other measures have a stronger claim on the limited time and energy of the body"; "Belief that the bill is sound in principle but politically inexpedient to be connected with"; "Unwillingness to have the bill's sponsors get credit for its enactment"; "Belief that the bill is sound in principle but defective in material particulars"; "Tentative approval, but belief that action should be withheld until the problem can be attacked on a broader front"; "Indecision, with or without one or another of the foregoing attitudes also"; "Belief that the matter should be left to be handled by the normal processes of judicial development of decisional law, including the overruling of outstanding decisions to the extent that the sound growth of the law requires"; "Positive approval of existing law as expressed in outstanding decisions of the Supreme Court"; "Ditto of the courts of appeals' decisions also"; "Ditto also of district court decisions"; "Ditto also of one or more varieties of outstanding administrative determinations"; "Etc., etc., etc., etc., etc.") [*Report to the Attorney General, Using and Misusing Legislative History: A Re-evaluation of the Status of Legislative History in Statutory Interpretation*, U S Dep't of Justice, Office of Legal Policy, January 5, 1989, p 113, n 485, citing Hart & Sacks, *The Legal Process: Basic Problems in the Making and Application of Law*, pp 1395-1396 (tent ed, 1958).]

courts that it considers erroneous. As Judge STEPHEN MARKMAN, of our Court of Appeals, insightfully observed on this topic in one of his scholarly writings, "no sensible theory of statutory interpretation would require Congress to devote a substantial portion of its time to extinguishing judicial forest fires." Markman, *On interpretation and non-interpretation*, 3 Benchmark 219, 226, n 60 (1987).

As is clear, in my view, this case is an excellent example of the misuse of the doctrine of legislative acquiescence. Indeed, whether it can ever be appropriate to use legislative acquiescence has in the past been the subject of heated debate on this Court. In *Autio v Proksch Construction Co*, 377 Mich 517, 527; 141 NW2d 81 (1966), Justice SOURIS described it as "a pernicious evil designed to relieve a court of its duty of self-correction" and indicated that it "has been examined and rejected by this Court before, but its current resurrection demands we perform the task once more lest our silence be construed as signifying its unanswerable validity." In the course of his discussion, Justice SOURIS quoted language from *Van Dorpel v Haven-Busch Co*, 350 Mich 135, 145-146; 85 NW2d 97 (1957), which is worthy of consideration:

> Now this beguiling doctrine of legislative assent by silence possesses a certain undeniable logic and charm. Nor are we oblivious to the flattery implicit therein; double flattery, in fact; flattery both to the profound learning and wisdom of the particular supreme court which has spoken, and flattery to a presumably alert and eagerly responsive State legislature. One pictures the legislators of our various States periodically clamoring and elbowing each other in their zeal to get at the pearls of wisdom embalmed in the latest decisions and advance sheets of their respective

supreme courts—and thenceforth indicating their unbounded approval by a vast and permanent silence.

Yet there are several dark shadows in this picture. For one, it suggests a legislative passion for reading and heeding the decisions of our supreme courts which we suspect may be scarcely borne out by the facts. For another, pushed too far such a doctrine suggests the interesting proposition that it is the legislatures which have now become the ultimate courts of last resort in our various States; that if they delay long enough to correct our errors those errors thus become both respectable and immutably frozen; and, finally, the larger and more dismal corollary that if enough people persist long enough in ignoring an injustice it thereby becomes just.

In the light of the foregoing discussion, while I do not believe that any form of legislative acquiescence can demonstrate that *Fiser* is viable after *Ross*, I would question the use of this analytical tool in this case, where the prerequisites for its use are so entirely lacking.

Beyond the governmental immunity issue, I further disagree that plaintiffs could establish negligence. I disagree that causation can be established in these cases. There are two decisions that the police officers made. The first was the decision to initiate a traffic stop. The second was the decision to pursue once the motorist began to flee. The first decision cannot be the proximate cause of the subsequent accident. Not only does common sense tell us this, but it is also the case that MCL 257.602a; MSA 9.2302(1) mandates that a motorist shall not wilfully fail to obey a police officer's direction to stop. In light of this statutory obligation on the part of the motorist, and the police officer's general obligation to apprehend persons breaking the law, what is foreseeable as a matter of

law for the police officer is that, especially absent some specific knowledge by the officer about this particular driver's propensity to flee, the officer can legitimately rely on the motorist complying with the statutory obligation to stop. *Placek v Sterling Heights*, 405 Mich 638, 673, n 18; 275 NW2d 511 (1979), citing *Arnold v Krug*, 279 Mich 702; 273 NW 322 (1937) (stating that a motorist may assume that other motorists will comply with the rules of the road). Therefore, it cannot be said in this case that it was reasonably foreseeable when the officer attempted to initiate the stop that the motorist would flee in a dangerous manner.

Further, regarding the officer's second decision, i.e., the decision to pursue once the motorist has commenced to flee, I would hold that plaintiffs cannot establish cause in fact. As is obvious, the motorist had already begun to flee before the decision to pursue was made.[3] There is no way, absent sheer speculation, to conclude that the officer's decision to pursue contributed to the eventual accident. The reason is that at some point the motorist would cease to flee. That could, however, be one hundred feet or one hundred miles later. To decide which is to speculate.

While some may argue that circumstantial evidence can establish cause in fact, "circumstantial proof

---

[3] The facts in *Ewing*, as described by the majority, highlight this fact. As noted above, once McGuigan was stopped by police officers, he "opened the driver's door of the pickup truck as if to get out. Suddenly, he slammed the door, drove across oncoming traffic, and fled south on Shaftsbury." *Ante* at 132, n 7. Clearly McGuigan's unlawful and reckless flight was initiated in response to a mere traffic stop and easily could have caused a serious accident at the point when he drove across oncoming traffic, before the police gave chase. This demonstrates that the officer's decision to pursue did not, in fact, cause the flight that culminated in the accidents at issue here.

must facilitate reasonable inferences of causation, not mere speculation." *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994). See also *Garabedian v William Beaumont Hosp*, 208 Mich App 473; 528 NW2d 809 (1995). To conclude that the police officer's decision to give pursuit or maintain pursuit was a cause in fact of the accident is nothing more than speculation based on the fact, evident now in hindsight, that the police gave chase and an accident subsequently occurred. This hindsight-based analysis, in a disciplined legal system, logically cannot be the basis for a finding of negligence. Indeed, it is to engage in the logical fallacy of post hoc ergo propter hoc (after this, therefore in consequence of this) that is impermissible. *Genesee Merchants Bank & Trust Co v Payne*, 381 Mich 234, 248; 161 NW2d 17 (1968) (KELLY, J.); *Kaminski v Grand Trunk W R Co*, 347 Mich 417; 79 NW2d 899 (1956); *Knowles v Knowles*, 185 Mich App 497, 499; 462 NW2d 777 (1990). Thus, plaintiffs cannot establish cause in fact, and plaintiffs' negligence claims should fail on this basis also.

On the basis of my conclusion that governmental immunity should apply in both these cases and that plaintiffs would be unable to prove negligence as a matter of law regarding the decisions to initiate a traffic stop and pursue the fleeing suspects, in *Ewing v Detroit*, I would reverse the decision of the Court of Appeals and reinstate the order of summary disposition in favor of defendant. In *Rogers v Detroit*, I would reverse the decision of the Court of Appeals, vacate the judgment for plaintiff, and, as requested by defendants, remand the case to the trial court for a new trial, limiting plaintiff to present only theories regarding the negligent operation of the police vehi-

cle. My resolution of these issues makes it unnecessary to reach the other issues addressed by the majority.

WEAVER, J., concurred with TAYLOR, J.

BOYLE, J. (*dissenting*). I concur with Justice TAYLOR's discussion of the causation issue with respect to both proximate cause and cause in fact. *Ante* at 166-168. Given that the defendants' decisions in these cases to initiate a traffic stop and to pursue fleeing motorists cannot reasonably support a finding for the plaintiffs on an element of the cause of action, I would hold that plaintiffs' negligence claims fail as a matter of law.